[Nos. G013880, G014430. Fourth Dist., Div. Three. June 10, 1994.]

In re the Marriage of CYNTHIA J. and ROBERT P. MOSCHETTA.
CYNTHIA J. MOSCHETTA, Respondent, v.
ROBERT P. MOSCHETTA, Appellant;
ELVIRA JORDAN, Intervener and Respondent.

COUNSEL

Nancy Bunn and David Bunn for Appellant.

Leslee J. Newman for Respondent.

Richard C. Gilbert and Diane J. Marlowe for Intervener and Respondent.

Harold L. Flamme and John L. Dodd for Minor.

OPINION

SILLS, P. J.—

## I.   INTRODUCTION

This case squarely presents the issue of the enforceability of a "traditional" surrogacy contract—an issue not addressed in California's first two surrogacy cases, *Johnson* v. *Calvert* (1993) 5 Cal.4th 84 [19 Cal.Rptr.2d 494, 851 P.2d 776] and *Adoption of Matthew B.* (1991) 232 Cal.App.3d 1239 [284 Cal.Rptr. 18]. ■ By "traditional" surrogacy we mean an arrangement where a woman is impregnated with the sperm of a married man with the prior understanding that the resulting child is to be legally the child of the

married man and his infertile wife.[1] It is to be contrasted with "gestational" surrogacy, where the sperm of the married man is artificially united with the egg of his wife, and the resulting embryo implanted in another woman's womb. It is also to be contrasted with cases where a sperm donor asserts parental rights.[2]

Traditional surrogacy is a relatively less expensive substitute for gestational surrogacy. Conception can be accomplished with a needleless syringe or similar device.[3] The resulting offspring, however, is genetically related to the "intended" father and the "*un*intended" mother.

In traditional surrogacy the so-called "surrogate" mother is not *only* the woman who gave birth to the child, but the child's *genetic* mother as well. She is, without doubt, the "natural" parent of the child, as is the father. This fact is critical if the "surrogate" changes her mind before she formally consents to an adoption. In such a case, only the initial agreement itself can arguably defeat her claim to parenthood.

In the present case, there has been no formal consent to adoption, so there is only the surrogacy agreement to deprive the "surrogate" of the legal parental tie she would otherwise possess. We decline to enforce the agreement, not for the public policy reasons sometimes advanced by those who oppose surrogacy,[4] but because enforcement of a traditional surrogacy contract *by itself* is incompatible with the parentage and adoption statutes already on the books.[5]

---

[1]Strictly speaking it is not absolutely required that the man be married or that the wife be infertile.

[2]E.g., *Jhordan C. v. Mary K.* (1986) 179 Cal.App.3d 386 [224 Cal.Rptr. 530].

[3]See Gallagher, Enemies of Eros (1989) at page 168 ("The first recorded case of artificial insemination took place in 1790. The procedure is so simple women can easily perform it themselves. All you need is a mechanical device to suck up and then expel liquid. . . . A turkey baster will . . . do.") (See also Wikler, *Society's Response to the New Reproductive Technologies: the Feminist Perspectives* (1986) 59 So.Cal.L.Rev. 1043, 1044, 1056; cf. *Jhordan C. v. Mary K., supra,* 179 Cal.App.3d at p. 390 [defendant "apparently performed the insemination by herself" or with help of a friend].)

[4]Justice Kennard summarizes, without editorial comment, a number of arguments against gestational surrogacy in her dissent in *Johnson v. Calvert, supra,* 5 Cal.4th at pages 107-110. These arguments, the core idea of which is a hostility to transactions between consenting adults which affect the legal status of parenthood, would appear to have equal force to traditional surrogacy. The leading judicial example of such hostility is *In re Baby M.* (1988) 109 N.J. 396 [537 A.2d 1227, 77 A.L.R.4th 1].

[5]By enforcement of the agreement, we mean the recognition of the parental rights sought to be established by the agreement. This case, like *Johnson v. Calvert,* involves a situation where the so-called surrogate mother changed her mind and sought parental rights and responsibilities which the surrogacy agreement contemplated she would not have. We do not reach the question of whether or how a traditional surrogacy agreement should be analyzed when all

## II.  Facts and Legal History

This portion of the opinion is adapted from the statement of decision of the trial court.

Robert and Cynthia Moschetta desired to start a family. Cynthia, however, is sterile. In February 1989 the Moschettas met with a surrogacy broker in Los Angeles who introduced them to Elvira Jordan. In late June and early July of the same year the Moschettas and Jordan signed an agreement which provided Jordan would be artificially inseminated with Robert Moschetta's semen so as to bear his "biological offspring." Jordan promised that Robert Moschetta could obtain sole custody and control of any child born. She also promised to sign all necessary papers to terminate her parental rights and "aid" Cynthia Moschetta in adopting the child. Robert and Cynthia agreed to pay Jordan $10,000 in "recognition" of Robert's "obligations to support [the] child and his right to provide [Jordan] with living expenses."

In November 1989 Jordan became pregnant through artificial insemination. However, by January 1990 the Moschettas were having marital problems, and in April Robert told Cynthia he wanted a divorce. Jordan learned of the Moschettas' domestic difficulties on May 27 while she was in labor. The next day she delivered baby Marissa.

Jordan began to reconsider the surrogacy agreement, and for two days she refused to allow Robert to see the baby. On May 31 she relented, and allowed Robert and Cynthia to take the child home after they told her they would stay together. However, the marriage deteriorated; and within seven months, on November 30, 1990, Robert left the family residence, taking Marissa with him. Less than a month later, on December 21, Cynthia filed a petition for legal separation (No. D324349), and a petition to establish custody of Marissa (No. 645368); less than a month after that, on January 11, 1991, she filed a petition to establish parental relationship, alleging she was the "de facto mother" of Marissa (No. AD 59584). In February Jordan sought to join the dissolution action (granted in March), while Robert filed responsive pleadings requesting a judgment of dissolution rather than legal separation.

The actions were consolidated and ordered trifurcated for trial, which commenced April 1991. The first phase determined the parental rights of Cynthia Moschetta and Elvira Jordan. The second phase determined custody and visitation rights. The third phase was the marital dissolution case apart

parties disclaim responsibility for the child (say, if the father died while the surrogate was still pregnant and the father's wife then wanted out of the agreement).

from the legal and physical custody of Marissa. At trial no party asked the court to enforce the surrogacy contract; all agreed it was unenforceable. At the time they did not have the benefit of *Johnson* v. *Calvert, supra,* 5 Cal.4th at page 95, which held that *gestational* surrogacy contracts do not, on their face, offend public policy. The judgment, filed in December 1992, provided Robert Moschetta and Elvira Jordan were the legal parents of Marissa and should each have joint legal and physical custody of the child.

Robert Moschetta has appealed from the judgment, challenging the determination that Elvira Jordan is the legal mother of Marissa. He also contends the trial court abused its discretion in awarding the parties joint legal and physical custody. In contrast to his concession at the trial level, and in the wake of *Johnson* v. *Calvert,* Robert Moschetta now contends that the surrogacy contract should be enforced. He also asserts his erstwhile wife, Cynthia Moschetta, is the legal mother of the child by virtue of the Uniform Parentage Act (Fam. Code, § 7600 et seq.).[6] Cynthia Moschetta did *not* initiate adoption proceedings and has filed a brief in this court *supporting* the judgment.

## III. DISCUSSION

### A. *Operation of the Uniform Parentage Act*

We examine Robert's Uniform Parentage Act position first. Robert presents two arguments concerning the operation of the Act. The first argument is: Under the Act, Cynthia Moschetta and Elvira Jordan are *equally* the mother of Marissa; but, under the Act, a child can have only one mother. *Johnson* v. *Calvert* solved this conundrum by breaking the tie in favor of the party who was originally intended to be the mother. Here, Cynthia was clearly intended to be the mother and therefore the "tie" should be broken in her "favor."[7]

The flaw in the argument is that Cynthia is not "equally" the mother of Marissa. In fact, she is not Marissa's mother at all. There is no "tie" to break.

To show that both Cynthia Moschetta and Elvira Jordan have equal claims to motherhood under the Act, Robert relies on two portions of the Uniform Parentage Act which establish certain legal presumptions concerning *fatherhood.* The first presumption is the traditional rule of law that the child of a

---

[6]All references to the "Act" are to the Uniform Parentage Act.

[7]We put quotation marks around "favor" because it is unclear whether it would really favor Cynthia Moschetta at all. In any event we do not reach the issue of liability for support when parties to a surrogacy agreement attempt to disclaim the parental responsibilities the agreement contemplates. (See fn. 5, *ante.*)

wife, cohabiting with her husband, is *conclusively* presumed to be a child of the marriage unless the husband is impotent or sterile. The rule is codified in Family Code section 7540, formerly Evidence Code section 621, subdivision (a): "Except as provided in Section 7541, the child of a wife cohabiting with her husband, who is not impotent or sterile, is conclusively presumed to be a child of the marriage." His argument asks us to treat women as interchangeable with men for the purposes of this presumption. According to Robert, applying this rule in a "gender-neutral" manner (i.e., simply reading "husband" for "wife" and "wife" for "husband") would mean that the child of a husband (and there is no dispute that Marissa is Robert's child), cohabiting with his wife, would also be conclusively presumed the child of the marriage.[8]

The argument fails because the presumption is not absolutely conclusive, and may be defeated by blood tests which show that the husband is not the genetic father of the child. The key phrase in California's statutory codification of the rule is, "Except as provided in Section 7541." Subdivision (a) of Family Code section 7541 provides that if the conclusions of "all the experts, as disclosed by the evidence based on blood tests," is that "the husband is not the father of the child, the question of paternity of the husband *shall be resolved accordingly*." (Italics added.) Even though Family Code section 7541, subdivision (a) is couched in terms of what "experts" say about blood tests rather than what those tests themselves actually reveal, the intent of the statute is undeniable: Genetic parenthood established by blood tests trumps a presumption based on the cohabitation of a married couple. The exceptions to this "blood test override" (essentially that the blood tests must be done within two years from the date of birth) do not apply here.[9] The trial court ordered blood tests on its own motion and established that Elvira Jordan is Marissa's genetic mother.

---

[8]Robert's premise is suspect. The Supreme Court's recent decision in *In re Zacharia D.* (1993) 6 Cal.4th 435 [24 Cal.Rptr.2d 751, 862 P.2d 751] is implicit authority for the idea that, in cases directly involving human reproduction, individuals of different sexes may be distinguished on the basis of different reproductive roles. *Zacharia D.* involved a natural father who did not "achieve" the "status" of "presumed" fatherhood (see *id.* at p. 449, fn. 15) of a child in the juvenile dependency system because he did not come forward early enough in the dependency process. (See *id.* at p. 451.) The court held he was not entitled to reunification services. The natural mother, to whom the child (a drug baby) was released after a brief period in protective custody following his birth, never faced the need to "achieve" the status of "presumed" motherhood.

[9]See Family Code section 7541, subdivisions (b) and (c). Subdivision (e) sets forth three other exceptions: the case reached final judgment of paternity on or before September 30, 1980, the *wife*, with the consent of her husband, was artificially inseminated with semen donated by a man not her husband (see Fam. Code, § 7613), and the wife, with the consent of her husband, "conceived by means of a surgical procedure." None of these other exceptions has any relevance to the case before us.

The argument also fails because it is undisputed Cynthia Moschetta is sterile. Even if we indulge the notion of gender interchangeability in the presumption, by its terms Family Code section 7540 only applies where the other spouse is not sterile.

Robert also presents a second argument based on an alternative presumption in the Act: A man is also presumed to be the natural father of a child if he "receives the child into his home and openly holds out the child as his natural child." (Fam. Code, § 7611, subd. (d).) Robert argues that because he and Cynthia took Marissa home from the hospital and Cynthia afterwards held the child out as her own, Cynthia should be presumed to be the natural mother because she "received" the child into her home. Therefore, just as Robert's "receiving" Marissa into his home would establish that he was the presumed father,[10] Cynthia's "receiving" Marissa into her home made Cynthia the child's presumed mother.

On the simplest level, the argument is unpersuasive because Cynthia never held Marissa out as her "natural" child. There never was any doubt that Marissa has no biological, natural or genetic connection with Cynthia.

A more fundamental reason the argument fails is that the statute simply does not have any reasonable application to surrogacy cases. The presumption is rooted in the old law of illegitimacy (see *In re Richard M.* (1975) 14 Cal.3d 783, 793 [122 Cal.Rptr. 531, 537 P.2d 363] ["receiving" element of the statute has been traditionally construed liberally with a view toward establishing a child's legitimacy]), and even then was to be applied in light of the "particular circumstances of the case." (*Id.* at p. 794.) The presumption allowed a child who was otherwise illegitimate (because he or she was born to a mother not married to the natural father) to attain the status of a legitimate child if the father acknowledged the child as his own and "received" the child into his household. While the legal status of illegitimacy has been abolished, the presumption has been retained because it continues to serve the function of settling questions of biological parenthood. In essence, it removes the doubt as to the identity of a child's *biological* father.

Again, assuming for the sake of argument that the statutory presumption can be made gender interchangeable, the statutory presumption is inapplicable because of the absence of doubt as to the identity of the natural mother. There is no question of *biological* parenthood to settle. Unlike the context of illegitimacy from which the presumption arose, in surrogacy there is no need to resort to presumptions. All parties know who gave birth and who is genetically related to whom.

---

[10]The topic of presumed fatherhood is discussed in detail in *In re Zacharia D.*, *supra*, 6 Cal.4th 435.

## B.  *The Enforceability of the Contract*

### 1.  *Should We Even Consider the Issue?*

Robert Moschetta's final argument is that the surrogacy contract should be enforced so as to preclude Elvira Jordan from being the legal mother of Marissa. Preliminarily, however, we must consider whether Robert Moschetta can make this argument on appeal, given his decision at trial not to request enforcement of the surrogacy contract and his concession (albeit without the benefit of the decision in *Johnson* v. *Calvert*) that the contract was unenforceable because it "was against social policy."[11]

■  The standard rule, of course, is that a party may not raise a new contention on appeal. There is an exception, however, in cases where a new point of law is decided after the trial (see *Fisher* v. *City of Berkeley* (1984) 37 Cal.3d 644, 654, fn. 3 [209 Cal.Rptr. 682, 693 P.2d 261] ["It is well settled that a court will consider on appeal a new point of law decided while the appeal is pending"])[12] or where the new theory "presents a question of law to be applied to undisputed facts in the record" (*Hoffman-Haag* v. *Transamerica Ins. Co.* (1991) 1 Cal.App.4th 10, 15 [1 Cal.Rptr.2d 805]).

These exceptions would easily be sufficient in the present case, were it not for the express waiver of the enforcement theory by Robert Moschetta at trial. One of the reasons parties are not normally allowed to raise new issues on appeal is that it is unfair to their opponents who did not have the opportunity to attack that theory factually or legally in the trial court, and to the trial court itself, which may be required to retry issues that might have been handled more efficiently the first time around. (See *Ernst* v. *Searle* (1933) 218 Cal. 233, 240-241 [22 P.2d 715].) In the case of the enforceability of a contract, these concerns are particularly potent because there are a number of fact-based defenses, including lack of capacity, actual fraud, and mistake of fact, which might have been developed in the trial court had the opposing party been given fair warning.

Ultimately however—and within the bounds of due process—application of the rule is discretionary with the reviewing court. (See 9 Witkin, Cal. Procedure, *supra*, Appeal, § 322. p. 332.) Here, we exercise our discretion to consider the new argument because surrogacy—and in particular the enforcement of contracts for traditional surrogacy—is a matter of intense

---

[11]The phrase is taken from a recitation in Robert Moschetta's own proposed statement of decision.

[12]Witkin describes the idea this way: "A court may refuse to follow the doctrine [of not hearing new arguments on appeal] where, after trial, there is a change in judicially declared law which validates a theory that would have been rejected if presented under the case law as it existed at the time of trial." (9 Witkin, Cal. Procedure (3d ed. 1985), Appeal, § 322, p. 333.)

public and legal concern,[13] and no California case has yet squarely considered the enforceability of such contracts. This vacuum makes it impossible for infertile couples and potential surrogate mothers to have a clear idea of their rights should they end up in court, like the parties in this case.

However, to avoid prejudice to the other parties, we have considered Robert Moschetta's contention with the understanding that should he prevail on the contract issue in the abstract, the most he could obtain on the parentage issue is a remand for further proceedings to allow the other parties to develop any factual defenses to the contract that were not otherwise presented to the trial court the first time around.

### 2. *The Merits of Enforceability*

As an intermediate appellate court we naturally look for guidance to the only surrogacy decision of our state Supreme Court.[14] To determine the merits of Robert Moschetta's enforceability argument, a detailed review of our Supreme Court's decision in *Johnson* v. *Calvert, supra,* 5 Cal.4th 84 is necessary.[15] Such a review demonstrates that enforcement of the traditional surrogacy contract here would be fundamentally incompatible with the rationale and analysis employed in *Johnson* v. *Calvert.*

After a brief introduction centering on the problem of determining the mother in the context of *gestational* surrogacy (5 Cal.4th at p. 87) and a statement of facts, *Johnson* v. *Calvert* begins its discussion with an exposition of the Act (*id.* at pp. 88-89). Of particular interest for our purposes is the court's recognition that while the Act was "not motivated by the need to resolve surrogacy disputes," the Act nevertheless "facially applies to *any*

---

[13]Surrogacy is one of those subjects where the law review articles easily outnumber the published decisions.

[14]Counsel for Elvira Jordan contended at the first oral argument that this court should ignore *Johnson* v. *Calvert,* which counsel compared to *Dred Scott* v. *Sanford* (1857) 60 U.S. (19 How.) 393 [15 L.Ed. 691]. Obviously the comparison was not meant as a compliment. *Dred Scott* has the odious distinction of holding that slaves were still property, subject to return to their owners, even if they managed to find their way to nonslave states. The decision is thought by some to have helped precipitate the Civil War. The comparison with *Dred Scott* is not only inapt, but borders on the insulting. It goes without saying, of course, that we decline counsel's invitation to stage an insurrection against the rule of stare decisis. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] ["The decisions of this court are binding upon and must be followed by all the state courts of California."].) (A second oral argument was necessitated by the death of Justice Henry T. Moore, Jr.)

[15]The other surrogacy case, *Adoption of Matthew B., supra,* 232 Cal.App.3d 1239, is essentially a procedure case, dealing with a traditional surrogate mother's attempt to withdraw her consent to adoption. The court took pains to demonstrate the result would be the same regardless of whether the surrogate contract was legal. (*Id.* at p. 1259.)

parentage determination" and "offers a mechanism to resolve" the pending surrogacy dispute. (*Id.* at p. 89.) Hence the court decides to "analyze the parties' contentions within the Act's framework." (*Ibid.*)

The opinion then analyzes "those few provisions of the Act directly addressing the issue of maternity" (see 5 Cal.4th at p. 90), including the obvious way of showing a woman gave birth to a child. In this discussion the court concludes that certain presumptions concerning paternity, such as the previously discussed receiving of a child into a man's home, do not apply. Such presumptions "describe situations in which substantial evidence points to a *particular* man as the natural father of the child" (*id.* at p. 91, italics added), while in the case before it, the "factual basis of each woman's claim is obvious." Accordingly, ". . . there is no need to resort to an evidentiary presumption to ascertain the identity of the natural mother." (*Ibid.*)

The opinion next concludes that both blood tests *and* the fact of giving birth can establish maternity under the Act, which it juxtaposes against the thought that "California law recognizes only one natural mother." (5 Cal.4th at p. 92.) After showing there is no preference for either method (see *id.* at pp. 92-93 and 92, fn. 9), i.e., that both the genetic mother and the birth mother are in a dead heat under the Act, the court comes to the punch-line: The tie is to be broken by reference to the "parties' intentions as manifested in the surrogacy agreement." (*Id.* at p. 93.) Looking to the parties' intentions means the child must be awarded to the intended, i.e., genetic, mother. The court then notes that the tie-breaker is used "when the two means [of showing maternity under the Act] do not *coincide in one woman.*" (*Id.* at p. 93, italics added.)

The next portion of the opinion provides support for the use of intent "as manifested in the surrogacy agreement" by reference to a number of scholarly works on surrogacy, and ends with the specter that a different result would unjustly impose parenthood on a surrogate birth mother where the intending genetic mother declined to accept the child. (See 5 Cal.4th at pp. 93-95.)

The court next bolsters its use of intent "as expressed" in the surrogacy contract by showing why the contract "is not, on its face, inconsistent with public policy." (5 Cal.4th at p. 95.) After a quick digression showing that no conclusions may be drawn from either the recent passage of a surrogacy bill by the Legislature or the Governor's veto of it, the opinion tackles a series of social policy arguments made by the birth mother in the case. (See generally, *id.* at pp. 95-97.)

At this juncture the court first states that "gestational" surrogacy differs from adoption in "crucial respects," and therefore "is not subject to the

adoption statutes." (5 Cal.4th at p. 96.) Among the reasons given is that the birth mother is not the genetic mother, and the circumstances of the child's conception involved in vitro fertilization and "related medical procedures." (*Ibid.*) The court then bats down one legal argument (involuntary servitude) and several social policy arguments (exploitation, dehumanization and inability to give true consent), and characterizes the idea that no surrogate mother can truly consent to a surrogacy contract as patronizing, if not outright discriminatory against women. (*Id.* at p. 97.)[16]

The balance of the majority opinion then disposes of the problem of whether the result in the case deprived the losing party of any *federal* rights and affirms the judgment of the Court of Appeal awarding parenthood to the genetic mother.

Significantly, both Justice Arabian's concurring and Justice Kennard's dissenting opinions *agree* with the majority opinion's basic structure of first concluding the genetic mother and the birth mother were "tied" under the Act and then breaking the tie. (See 5 Cal.4th at p. 101 (conc. opn. of Arabian, J.) and p. 103 (dis. opn. of Kennard, J.).) Justice Arabian concurred because he sees no reason to go beyond the tie-breaker to address the question of whether surrogacy contracts are inconsistent with public policy. Justice Kennard dissents because she advocates a *different* tie-breaker, namely the best interest of the child.

We have gone to some length in discussing *Johnson* v. *Calvert, supra,* 5 Cal.4th to demonstrate beyond cavil two important points. First, the *Johnson* court never reached the issue of whether traditional surrogacy contracts are enforceable in their own right. The most that can be safely extracted from the opinion is that *gestational* surrogacy contracts do not necessarily offend public policy. Indeed, the court did not actually hold that the gestational surrogacy contract at issue in *Johnson* v. *Calvert* was enforceable as such. Rather, the court stated that such a contract is a proper basis on which to *ascertain the intent* of the parties because it does not offend public policy "on its face." (See 5 Cal.4th at p. 95.) In *Johnson* v. *Calvert* the function of the surrogacy contract was to serve as a vessel in which the parties could manifest or express their intention. (*Id.* at p. 93.) The gestational surrogacy contract was never held to be enforceable per se.

The other point—and it is one on which all the members of the *Johnson* v. *Calvert* court appeared to agree—is that cases of gestational surrogacy are

---

[16]The exact language is: "The argument that a woman cannot knowingly and intelligently agree to gestate and deliver a baby for intending parents carries overtones of the reasoning that for centuries prevented women from attaining equal economic rights and professional status under the law."

properly analyzed in terms of parentage as it is determined under the Act. Hence there is a need for some tie-breaker because genetic-but-not-birth mothers and birth-but-not-genetic mothers have equal claims to maternity under the terms of the Act.

Robert Moschetta's core argument is that in determining that gestational surrogacy contracts are not inconsistent with public policy, the court in *Johnson* v. *Calvert* was necessarily saying traditional surrogacy contracts must be enforced according to their terms. As we have just shown, this is not true. The Supreme Court never said that gestational surrogacy contracts were enforceable *per se,* much less *traditional* surrogacy contracts.

Moreover, the framework employed by *Johnson* v. *Calvert* of first determining parentage under the Act is dispositive of the case before us. In *Johnson* v. *Calvert* our Supreme Court *first* ascertained parentage under the Act; only when the operation of the Act yielded an ambiguous result did the court resolve the matter by intent as expressed in the agreement. In the present case, by contrast, parentage is easily resolved in Elvira Jordan *under the terms of the Act.* Here, apropos the language in *Johnson* v. *Calvert, supra,* 5 Cal.4th on page 93 of the opinion, the two usual means of showing maternity—genetics and birth—*coincide in one woman.*

Having established that Elvira Jordan is the mother under the terms of the Act, the question next arises whether the surrogacy contract can serve as an adoption agreement. We think not; there is no basis on which to so hold. Under Family Code section 8814, an adoption statute, "birth parents" must specifically consent to an adoption in the presence of a social worker. There was no such consent here.

We thus decline to enforce the traditional surrogacy contract in this case because to do so would mean we would have to ignore both the analysis used by our Supreme Court in *Johnson* v. *Calvert* and the adoption statute that requires a formal consent to a child's adoption by his or her birth mother. The judgment declaring Elvira Jordan the legal mother of Marissa must therefore be affirmed.

### C.   *Joint Custody*

The trial judge appointed a clinical psychologist and a marriage, family and child counselor as independent experts to recommend which custody arrangements would be in Marissa's best interests. (See Evid. Code, § 730 [court may appoint experts to investigate and report back on the matter as to which expert evidence is or may be required].)

In their joint report both experts recommended that Marissa's primary residence continue to be with her father. They noted that Robert showed "an acute sensitivity for his daughter's developmental needs" and Marissa had "continued to do well and thrive in the care of her father." Robert showed "no indications of any major deficits in his parenting skills."

By contrast, the experts thought Elvira Jordan had "difficulty in setting structure and limits as her children grow." Her two older children had dropped out of school and her eldest had "problems related to drugs." Her "attitudes, competitiveness, lack of self-awareness, and possessiveness" limited the type of custody plan that could be developed. The psychologist and the counselor noted Elvira Jordan's ability to benefit from professional help was "guarded."

Despite the recommendation of the psychologist and counselor, the trial court chose to award joint legal and physical custody to both Robert Moschetta and Elvira Jordan. Robert got physical custody on weekends and in the evenings, Elvira Jordan on weekdays.

The trial judge wrote a thorough and lucid statement of decision, taking a variety of factors into account in deciding to split custody down the middle. These factors included the status quo (which favored Robert Moschetta), respective parenting qualities (the judge wrote that Robert had an apparent "lack of sensitivity to the needs of the child as separate from his own" whereas Elvira Jordan's attitude was one of "giving" the "gift of life" to an infertile couple) and the importance of a child's having contact with both parents (the judge noted that Marissa would "benefit from regular contact with her mother in her mother's home"). If this were a run-of-the-mill child custody case, we would be hard put to find any abuse of discretion in the decision given the thoroughness of the trial judge's statement of decision.[17]

But this is not a run-of-the-mill custody case; this is a case of first impression in California. We must reverse because the trial judge explicitly took into account two factors that were inherent in the very uniqueness of this litigation, and which should not have been considered.

Specifically, the trial judge considered both (1) Robert's legal and personal position that Elvira Jordan was not Marissa's true mother and (2) the

---

[17]Which is not to say that it would be an automatic affirmance. One issue in particular is troubling: Robert contends that Elvira Jordan got favorable treatment because she was a woman, and that a man in her circumstances (including her record with her other children and past welfare fraud) would never have received joint physical custody. Because the question of physical custody must be remanded in any event, we do not reach this issue. It is enough to reiterate the rule that courts must eschew "preconceptions about the parties because of their gender" in the process of decisionmaking. (See *In re Marriage of Iverson* (1992) 11 Cal.App.4th 1495, 1499 [15 Cal.Rptr.2d 70].) (Cf. fn. 19, *post.*)

circumstances surrounding the very surrogacy controversy itself in which the parties were embroiled. The trial judge wrote: "[A]lmost a year of Marissa's precious development had been eaten up in what the Court considered to be unnecessarily and aggressive litigation by Robert over Elvira's maternity." Elsewhere the trial judge stated that she chose joint custody because, among other things, of Robert's "predisposition about Elvira." The court contrasted Elvira Jordan's "intent" to "give the gift of life to an infertile couple," with Robert's "mindset" and "manipulative" behavior in "knowingly marr[ying] an infertile woman" and his tactics in attempting to obtain custody of his daughter in the wake of the breakup of his marriage and Elvira Jordan's reluctance to release Marissa after birth. Especially "problematic" was Robert's position at trial that he could serve as sole parent to Marissa and his reluctance to acknowledge Elvira Jordan as the girl's mother.

Taking these matters into consideration was error. In doing so, the court was, in effect, penalizing Robert for taking a position on a legal question of first impression.[18] The court *assumed* that Elvira Jordan's claim to motherhood had *already* been established, and evaluated Robert's attitude toward and interactions with Jordan as if he had no right to question her parental claims. While Robert does not prevail in today's decision on that point, his position can hardly be described as frivolous. After all, Marissa would never have been conceived if Elvira Jordan had not agreed, *in advance of the conception*, to relinquish her parental claims.[19]

As noted above, the question of surrogacy is a question of intense public interest. Whether a surrogate mother should have the same rights as other natural parents (or should be held to her initial agreement) is a topic on the very frontier of the law. Under such circumstances Robert was well within his rights to advocate the position that he was Marissa's only legal parent, and to take a less than welcoming view of Elvira Jordan's claim.

Additionally, the fact that Robert married an infertile woman and agreed at the hospital to try to make his marriage work in order to be able to take his daughter home from the hospital, while "manipulative" according to the trial

---

[18]We do not think that just because Robert had concluded by the time of trial—and before *Johnson* v. *Calvert* was decided—that the surrogacy agreement was unenforceable, that he could not in good faith have taken the position that Elvira Jordan should not be the legal mother of his child.

[19]The idea that Robert's position would mean that Marissa would have only one parent clearly disturbed the trial court. The fact is, however, that California's artificial insemination laws allow a *single woman* to have a child where there is no legal father. (See Fam. Code, § 7613, subd. (b) [donor of semen provided to licensed physician and surgeon for use in artificial insemination of a woman—presumably even an unmarried one—is treated in law as if he were not the natural father of the child].)

court, is absolutely irrelevant to the question of *Marissa's* best interests in terms of which parent should have primary custody.

It is common knowledge among family law practitioners that the quickest way for a parent to lose primary physical custody is for that parent to obstruct the visitation rights of the other parent. There is more than a bit of this idea in the trial court's statement of decision. The statement of decision treats Robert Moschetta as a recalcitrant divorced parent who obstructs the legitimate visitation rights of a former spouse.

We cannot say that the outcome would have been the same had the trial court not taken Robert's position toward Elvira Jordan and his tactics at the time of birth into account. We therefore reverse the judgment so far as it awards joint physical and legal custody of Marissa to both Robert Moschetta and Elvira Jordan, and remand the matter to the trial court for reevaluation as to whether Robert should be awarded primary physical custody. This reevaluation must be without regard to Robert's "predisposition" toward Elvira Jordan, the fact that he married an infertile woman, or his tactics and positions in this case up to now. Of course, now that Elvira Jordan's parental claim has been established, Robert's present willingness to allow Jordan visitation, should he be awarded primary physical custody, does become relevant.

Our decision also renders Robert's contention that the trial court should have reconsidered its decision when the involvement of Jordan's eldest son in a drug-related murder came to light moot.[20] The remand will allow the trial court to evaluate custody in light of currently relevant factors, including any threat that Jordan's eldest son might pose by virtue of his involvement with drugs or gangs.[21]

## CONCLUSION

While we affirm the judgment so far as it vests parental rights in the surrogate mother, we are not unmindful of the practical effect of our

[20]After trial, Robert Moschetta attempted to reopen the custody issue by introducing evidence that Jordan's elder son Ricardo had been involved in a drug-related murder, was wounded in the course of a robbery, and had been sent to prison. The court refused to modify its custody order in light of this revelation.

[21]We reject Robert's contention that joint physical custody is per se inappropriate for surrogacy deals gone awry. The logic of holding that Elvira Jordan is the legal as well as natural mother of Marissa compels the conclusion that joint physical custody *may* be appropriate if it is indeed in the child's best interest. (Cf. Fam. Code, § 3082.)

decision in light of *Johnson* v. *Calvert*. Infertile couples who can afford the high-tech solution of in vitro fertilization and embryo implantation in another woman's womb can be reasonably assured of being judged the legal parents of the child, even if the surrogate reneges on her agreement. Couples who cannot afford in vitro fertilization and embryo implantation, or who resort to traditional surrogacy because the female does not have eggs suitable for in vitro fertilization, have no assurance their intentions will be honored in a court of law. For them and the child, biology is destiny.

The result is disquieting. Much has been written in the surrogacy area of the pain visited on the birth mother who contemplates giving up her child. Not so much appears to have been written about the disruption to the intended parents, who have—to put the matter in classic estoppel language—relied to their detriment in deciding to bring a child into the world. Let us be blunt here: Marissa would never have been born if Robert and Cynthia Moschetta had known Elvira Jordan would change her mind.[22] On this point Robert Moschetta is certainly correct that surrogacy is fundamentally different than adoption, which contemplates a child already conceived.

On the other hand, there is also no doubt that enforcement of a surrogacy contract prior to a child's birth presents a host of thorny legal problems, particularly if such contracts were specifically enforced.[23] Any result is disquieting.

Once again the need for legislative guidance regarding the difficult problems arising from surrogacy arrangements is apparent.[24] The alternative is to let the matter go by default to the operation of the Uniform Parentage Act, which, as our Supreme Court noted in *Johnson* v. *Calvert*, was not enacted with surrogacy in mind.

The law as it now stands compels that the judgment be affirmed as it establishes Robert Moschetta and Elvira Jordan as Marissa's father and mother. The judgment is reversed so far as it awards joint physical custody to both parents. The matter of physical custody is remanded for reevaluation

---

[22]Of course, Jordan's actions were precipitated by the failure of the Moschettas' marriage, a contingency unforeseen in the parties' agreement.

[23]What if a surrogate mother took drugs or alcohol during her pregnancy in violation of her contract? Or wanted an abortion? Could the contract be enforced by court order and subsequent contempt? Would there be a "surrogate mother's tank" in the local jail?

[24]See Note, *Selling the Womb: Can the Feminist Critique of Surrogacy Be Answered?* (1992) 68 Ind. L.J. 205, 210 (noting tendency of courts to request legislative action in surrogacy area).

in light of the views expressed in this opinion. Each party is to bear its own costs on appeal.

Crosby, J., and Rylaarsdam, J.,* concurred.

A petition for a rehearing was denied June 29, 1994, and appellant's petition for review by the Supreme Court was denied October 13, 1994.

---

*Judge of the Orange Superior Court sitting under assignment by the Chairperson of the Judicial Council.