[No. G019080. Fourth Dist., Div. Three. Feb. 6, 1996.]

JAYCEE B., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
JOHN B. et al., Real Parties in Interest.

**COUNSEL**

Jeffrey W. Doeringer for Petitioner.

Schwamb & Stabile, Thomas P. Stabile and Robert C. Bergen for Real Parties in Interest.

## OPINION

## SILLS, P. J.—

### I. INTRODUCTION

The facts of this surrogacy case would seem to be the most extraordinary to date. A married couple sought to have a child by gestational surrogacy. (See generally, *Johnson* v. *Calvert* (1993) 5 Cal.4th 84 [19 Cal.Rptr.2d 494, 851 P.2d 776].) Gestational surrogacy means that the husband's sperm is artificially united with the egg of his wife and the resulting embryo is implanted in another woman's uterus, who then carries the child to term. (See *Johnson, supra*, 5 Cal.4th at p. 87; see also *In re Marriage of Moschetta* (1994) 25 Cal.App.4th 1218, 1222 [30 Cal.Rptr.2d 893].) The child is usually the genetic offspring of the married couple, but not the birth mother.[1] We say "usually" because that is not quite what has been alleged to have happened here.

In this case, pursuant to a written contract between four people—a husband, wife, another woman and her husband—a sperm and an egg from *anonymous* donors were artificially united and implanted in the uterus of the other woman, with the intention that the offspring would be legally the child of the married couple. Unlike "usual" gestational surrogacy, here the child is not genetically related to the intended parents.

This case is also unusual in how it comes to this court. Unlike *Johnson* and *Moschetta*, it does not involve the so-called surrogate mother reneging on an agreement and seeking to establish her own parental rights vis-à-vis the child. Rather, about a month before the birth of the child, the married couple separated and dissolution proceedings soon followed. The child was born and the hospital released the child to the wife—the intended mother under the contract. Several months later the wife, in the dissolution action, brought an order to show cause proceeding seeking pendente lite child support, that is, temporary child support pending final adjudication of the matter, from the husband who was the intended father under the contract.

The husband was willing to stipulate that he had signed the contract, but he vigorously disputed the jurisdiction of the family law court to award even temporary support. He claimed the family court could not make such an

---

[1] E.g., *Belsito* v. *Clark* (1994) 67 Ohio Misc.2d 54 [644 N.E.2d 760] (woman who carried child was sister of wife whose egg was united with husband's sperm). A variation on the usual theme is where the sperm of the husband is united with the egg of an anonymous donor, and the embryo is implanted in the wife. (See *McDonald* v. *McDonald* (1994) 196 A.D.2d 7 [608 N.Y.S.2d 477].)

award because it had not yet been established that the child here was indeed a "child of the marriage." (See Fam. Code, § 2010 ["In a proceeding for dissolution of marriage . . . the court has jurisdiction to inquire into and render any judgment and make orders that are appropriate concerning . . . [¶] . . . [¶] (b) The custody of minor children of the marriage. [¶] (c) The support of children for whom support may be ordered, including children born after the filing of the initial petition . . . ."].)

The trial judge agreed with the husband and ruled the court had no jurisdiction to make a temporary child support order. Essentially, he reasoned that the wife's remedy was first to get an order from the probate court decreeing the child had been adopted. The judge did not address the point raised by the wife's counsel that a probate court could not *force* the husband to sign adoption papers. However, he acknowledged he was putting the wife in a "Catch-22" situation: requiring her to first establish that the husband was the father of the child before she could obtain an order forcing him to contribute to the child's support.

The trial judge also recognized the case was one of first impression, and that the child might have rights independent of those of the married couple. And he recognized the effect of his decision was to put the economic burden on the wife to challenge his decision by petition for extraordinary writ, so he appointed independent counsel for the minor. The trial judge then continued the matter to give the minor's counsel time to file the petition.

That petition was filed about two weeks ago. We then invited informal responses from both spouses and the trial court. The wife, of course, sides with the minor, arguing the family law court has jurisdiction. The husband argues there is no legal basis for establishing his paternity, and until a probate court action establishes some type of parentage, there is no jurisdiction for the family law court to award temporary support.

As we now explain, the petition must be granted. We need not—and do not—decide at this juncture whether the child is legally the husband's daughter. It is enough to hold that the wife has made a sufficient showing that the child will be when the question is ultimately settled, by (depending on how far up the ladder this case goes) the trial court, this court, or our Supreme Court. Under facts as were stipulated to by the parties at the hearing, the family law court has jurisdiction to make an order forcing the husband to pay temporary child support until the issue of his parenthood is finally decided.

We therefore issue the requested writ, and direct the family law court to determine an appropriate child support order given the circumstances of the

parties. (See Fam. Code, § 3600 ["During the pendency of any proceeding for dissolution of marriage . . . or in any proceeding where there is at issue the support of a minor child or a child for whom support is authorized under Section 3901 . . . the court may order . . . either or both parents to pay any amount necessary for the support of the child, as the case may be."]; Fam. Code, § 3901 [defining duration of duty of support imposed by § 3900]; Fam. Code, § 3900 ["Subject to this division, the father and mother of a minor child have an equal responsibility to support their child in the manner suitable to the child's circumstances."].)

## II.  ADDITIONAL FACTS

While the introduction to this opinion covers the essential facts, here is a more detailed rendering of the events leading to this writ petition.

John and Luanne were married in May 1989. On March 30, 1995, John filed a petition for dissolution of marriage. He alleged that the couple separated in September 1994, and there were no minor children.[2]

Luanne filed her response April 20, 1995. Instead of agreeing with John that there were no minor children, she asserted that the "[p]arties" were "expecting a child by way of surrogate contract" and that the doctor indicated the birth would be about May 5. Luanne attached a copy of the surrogacy contract to her response.

The surrogacy contract was signed by John, Luanne, a woman named Pamela, and Pamela's husband, Randy. Under the terms of the contract, Pamela was to be "implanted with the embryo(s) created with donated genetic material, unrelated to any of the parties. The child [was] to be taken into the home of the Intended Father and Intended Mother and raised by them as their child, without interference by the Surrogate [Pamela] or her husband, and without retention or assertion by the Surrogate and her husband of any parental rights." Among other terms, the contract provided that if the "Intended Mother" died prior to the child's birth, the child would be placed with the "Intended Father," and vice versa. If both intended parents died before the child's birth, the surrogate and her husband were to place the child into the custody of the guardians or intended guardians of the intended parents' children in accordance with the terms of their will.

The contract made reference to *Johnson* v. *Calvert*, *supra*, 5 Cal.4th 84, but recited that the *Johnson* decision had "not been specifically extended" to

---

[2]Because of the procedural posture of the case we must tell the story as it unfolds in the pleadings, rather than in direct chronological order.

these facts. "As such," the document went on, "the parties understand that parentage and custody issues have not been fully settled, and no warranties have been or can be made as to the ultimate cost, liability or obligation of the parties which may result from judicial process arising out of this Agreement."

The date the contract was signed by John and Luanne is not apparent, as neither filled in the line marked "DATED" by their signatures. Pamela and her husband signed the agreement August 25, 1994.

On October 12, 1995, Luanne filed an order to show cause seeking, among other things, sole custody of, and child support for, Jaycee, who had been born April 26, 1995. On that day John filed a responsive declaration opposing the requests for custody and support because the family court lacked jurisdiction.

The matter was called for hearing on November 30. John's attorney stated that John would stipulate he had entered into the surrogacy contract, though he disputed its legality and effect. There was no dispute that the child had been released from the hospital to Luanne, and was living with her. The trial judge concluded there was no jurisdiction, but did appoint separate counsel for the minor. The case was continued to February 6, 1996, including the question of counsel fees for the minor's newly appointed lawyer. The writ petition was filed on January 18, 1996, informal responses to it were invited, and were received on January 31.

III.  THE FAMILY COURT HAS JURISDICTION TO MAKE A PENDENTE LITE CHILD SUPPORT ORDER IN THIS GESTATIONAL SURROGACY CASE

A.  *Analogous Case Law Shows That Courts May Make Pendente Lite Support Orders Even When the Relationship Giving Rise to the Duty of Support Has Not Yet Been Conclusively Established*

While this case is obviously one of first impression, it involves a "Catch-22" or chicken-and-egg problem which *is* familiar to the courts, and which our Supreme Court has already solved, albeit in decisions more resembling *Sense and Sensibility* than *Cells and Surrogacy*.

The present case is the functional equivalent of a paternity action, where a mother who is the caretaker of a child seeks court-ordered support from a man *but for whose actions* the child would never have come into existence. As in a classic paternity action, this case involves the conundrum of a court's authority to order a man to pay child support before it is authoritatively

adjudicated that he is the child's father: If jurisdiction depends on first establishing the fact of parentage by final decree, then there can be no jurisdiction to award support prior to such an adjudication. (And, of course, if the paternity defendant really is the father of the child, it means that he escapes his duty to support the child for the duration of the litigation over the parentage issue.)

The paternity conundrum came before the California Supreme Court in *Carbone v. Superior Court* (1941) 18 Cal.2d 768 [117 P.2d 872, 136 A.L.R. 1260]. There, an illegitimate child brought a paternity action through her mother. On an order to show cause, the child sought support, court costs, and attorney fees "pending determination of the action." Like the present case, the man who was sued (we will not yet refer to John here as the "father") objected that the court had no jurisdiction to make him pay even temporary support because he had not yet been adjudged the father, and, like the present case, the trial court bought the argument and refused to hold a hearing. And, like the present case, the child then petitioned for an order to compel the trial court to hold a hearing. (*Id.* at pp. 769-770.) The man who was sued contended again before the Supreme Court that he could not "be ordered to support the plaintiff until he is proved to be her father." (*Id.* at p. 771.)

Justice Traynor, writing for a unanimous court, solved the problem by reasoning by analogy. "The situation" before the court, he wrote, "is basically the same as in a divorce action when the fact of marriage is denied." (18 Cal.2d at p. 771.) After first acknowledging that "[p]roof of parentage is a jurisdictional prerequisite for an order to support an illegitimate child," he stated that "[e]ven though the defendant in an action for divorce denies the existence of the marriage, the court may nevertheless make the order if defendant is given an opportunity to be heard and the marriage is proved by a preponderance of the evidence." (*Id.* at pp. 771-772.) For the latter supposition he cited two cases, *Hite v. Hite* (1899) 124 Cal. 389 [57 P. 227] and *Bancroft v. Bancroft* (1935) 9 Cal.App.2d 464 [50 P.2d 465].

And the way the marriage cases had solved the problem was to make a preliminary determination of the probable existence of the legal relationship upon which the pendente lite order was predicated. Traynor wrote, "Although such an order implies a finding of the existence of the relationship, the proceeding need not be so complete nor the evidence so extensive as upon the trial of the issues of the case and the order therefore does not determine those issues nor affect the final judgment." (*Carbone v. Superior Court, supra,* 18 Cal.2d at p. 772.) For this he cited *Hite* and *Sharon v. Sharon* (1888) 75 Cal. 1 [16 P. 345].

In the wake of the *Carbone* decision, it has even been held that a local government entity seeking recovery of welfare payments can obtain pendente lite child support orders pending final determination of paternity. (*City and County of San Francisco* v. *Superior Court* (1978) 86 Cal.App.3d 87, 90-91 [150 Cal.Rptr. 45] [allowing pendente lite child support order against putative fathers because it makes no difference that provider of support is county government].)

The precise quantum of proof necessary to show the probable existence of the legal relationship of paternity and marriage upon which a temporary support order could be predicated has been a somewhat troublesome matter, at least as revealed in the late 19th century marriage case of *Hite* v. *Hite*. In *Hite*, a man who was sued for divorce denied he was ever married to the plaintiff. The three-justice lead opinion concluded the trial judge did not intend to hold there was a "preponderance in favor of the fact of marriage," but did so without much discussion of the facts which led them to so conclude. Accordingly, the court reversed a pendente lite alimony and suit money order. (*Hite* v. *Hite*, *supra*, 124 Cal. at p. 395 (lead opn. of Temple, J.).)

Chief Justice Beatty concurred separately to emphasize the point made in the majority opinion (see 124 Cal. at p. 392) that a mere prima facie case—that is, one where the decision would be made without the defendant being able to tell his side of the story—would not be sufficient. (See *id.* at pp. 396-397 (conc. opn. of Beatty, C. J.).) His point was that the defendant had made a "complete denial of the facts alleged by plaintiff as constituting a marriage," and "until that issue [was] tried and determined by final judgment the plaintiff ha[d] no claim upon [the defendant] as his wife." (*Ibid.*) Justice Harrison also concurred separately. Even though he agreed with the lead opinion, he wrote to emphasize that where the fact of the marriage was denied, the defendant should be entitled to "a hearing and an opportunity to controvert the showing made by the plaintiff upon her application for [pendente lite] alimony as at the final hearing of the action . . . ." (*Id.* at p. 400 (conc. opn. of Harrison, J.).)

The dissenting opinion of Justice McFarland pointed out the Catch-22 bind created by the majority's result: the plaintiff was left to "rely entirely upon herself" to prove her case. Justice McFarland did not, however, discuss the quantum of evidence necessary to obtain a pendente lite order. (See 124 Cal. at p. 401 (dis. opn. of McFarland, J.).) That task was left to the separate dissenting opinion of Justice Garoutte.

On the quantum of evidence point Justice Garoutte attacked the lead opinion as enunciating a rule "opposed to the great weight of authority,"

including *Sharon* v. *Sharon, supra,* 75 Cal. 1, 45, decided 11 years earlier, which had indicated a prima facie case would do. (*Hite* v. *Hite, supra,* 124 Cal. at pp. 403-404 (dis. opn. of Garoutte, J.).) He then took issue with the majority on their own terms, arguing that the evidence presented by the plaintiff really did establish the existence of the marriage by a preponderance of the evidence. (*Id.* at p. 405 (dis. opn. of Garoutte, J.).)

While Justice Traynor in *Carbone* did not quite say the proof necessary to establish paternity for purposes of a pendente lite order was the *Hite* case's "preponderance of the evidence," he did hint strongly in that direction by citing the opinion and stating the rule for marriage cases was proof by a preponderance of the evidence. (See *Carbone* v. *Superior, supra,* 18 Cal.2d at p. 772.) Interestingly enough, though, another panel of our own court, in a paternity action where the mother sought to discover financial information from an alleged father, indicated it was enough that there be a "prima facie showing of paternity" to compel financial records other than tax returns. (*Thomas B.* v. *Superior Court* (1985) 175 Cal.App.3d 255, 258 [220 Cal.Rptr. 577].) In *Thomas B.* this court stated that in an action to establish parentage there were four component parts, the first of which was "a prima facie showing of paternity for purposes of pendente lite support." (*Id.* at p. 265.) The phrase was repeated by another panel of this court again in *Sherry H.* v. *Thomas B.* (1988) 203 Cal.App.3d 1500 [250 Cal.Rptr. 830], which stated that a pendente lite attorney fee award in a paternity case could be justified "as a form of interim support," thus allowing resort to the defendant's personal financial records. (*Id.* at pp. 1503-1504.)

We need not explore the question of whether there is some difference between denial-of-marriage cases and paternity cases which would justify use of a prima facie standard in the latter but not the former, assuming arguendo that the Supreme Court's decision in *Carbone* would allow for something less than a preponderance of the evidence standard in a paternity case. As we are about to explain, the showing made at the order to show cause in this case would satisfy a preponderance of the evidence standard, even without finally deciding the question of whether John is the legal father of Jaycee.

### B. *Because There Is No Dispute That the Husband Signed the Surrogacy Contract, There Is Sufficient Proof to Make a Pendente Lite Child Support Order*

In the paternity and marriage cases previously discussed, the result turned on the resolution of a *factual* dispute. A man was or was not the father of a child (*Carbone*); a marriage had or had not taken place (*Hite*). The problem

faced by the court was not one where the basic facts were settled, but the *legal significance* of those facts was at issue; rather, the most basic facts were unsettled at the time the moving party applied for a support order.

A 1935 case, *Bancroft* v. *Bancroft, supra,* 9 Cal.App.2d 464, was quick to pick up on the distinction between a dispute over a basic jurisdictional fact (like whether there was a marriage in the first place), and the legal significance of an event (like whether an earlier divorce decree was valid) which might bear on the existence of a legal relationship. In the latter case, the admission of the basic jurisdictional fact was enough to establish the legal relationship upon which a support order could be based, even though a court might later hold that the relationship did not exist.

*Bancroft* was a marriage case where the plaintiff sought temporary alimony. She alleged she was married to the defendant; the defendant admitted he had participated in a marriage ceremony with her in 1913, but denied that they were ever legally married because the plaintiff had never been properly divorced from a previous husband. (See 9 Cal.App.2d at pp. 465-466.) Taking his cue from *Hite,* the defendant challenged a $20-per-week support order on the theory that the plaintiff had to prove the marriage by a preponderance of the evidence before she could receive even temporary support. (*Ibid.*)

The appellate court rejected the defendant's contention by distinguishing the *Hite* case. In *Hite,* the defendant had denied the *fact* of marriage; since the *fact* of marriage had not been established by a preponderance of the evidence, the plaintiff was not allowed pendente lite support. (See *Bancroft* v. *Bancroft, supra,* 9 Cal.App.2d at p. 467.) But in the *Bancroft* case, the defendant had *not* denied the *fact* of the marriage. Rather, "[a]ll that he did was to *deny the legal effect* of this marriage for the reason that the plaintiff was under a supposed disability that prevented her from entering into a lawful marriage with him." (*Ibid.,* italics added.) Because the fact of the marriage had been established, the trial court in the *Bancroft* case "was fully justified" in concluding that the plaintiff had established her marriage "by a preponderance of the evidence," so there was no error in making the temporary support order. (*Id.* at p. 469.)

In this case, as in *Bancroft,* the dispute does not concern the *fact* of an agreement, but its legal effect. As his attorney told the court, John was willing to stipulate that he signed the contract. The critical question thus becomes whether the surrogacy contract is sufficient to show—by a preponderance of the evidence—that John is Jaycee's father, taking into account that the adjudication of parenthood need not be "so conclusively established"

as it would be for purposes of a final adjudication of the matter. (9 Cal.App.2d at p. 468; see also *Carbone* v. *Superior Court, supra,* 18 Cal.2d at p. 772 [evidence to support pendente lite paternity order need not be "so complete" or "so extensive" as to constitute a final determination].)

In essence, the question becomes one of law, not fact. At the same time, we must bear in mind that we are *not* going to decide the ultimate issue in this writ proceeding brought merely to ascertain whether there is jurisdiction to award child support. We must deal in legal probabilities in much the same way that trial courts do when they decide applications for preliminary injunctions. Given the admission he signed the surrogacy agreement, is it likely that John will ultimately be held to be the father?

We turn for the answer, as we did in *In re Marriage of Moschetta, supra,* 25 Cal.App.4th at page 1228, to the only surrogacy decision of our state Supreme Court, *Johnson* v. *Calvert, supra,* 5 Cal.4th 84.

*Johnson* was a gestational surrogacy case where, unlike the present situation, the "intended" parents were also the genetic parents. The dispute was between those intended parents and the woman who gave birth to the child. Our Supreme Court first demonstrated that under the Uniform Parentage Act both the intended (genetic) mother and the birth mother could establish parentage. (See *Johnson* v. *Calvert, supra,* 5 Cal.4th at p. 92.) The court next established there was no preference for either method of showing parenthood under the act, blood tests showing a genetic relationship or the fact of giving birth. Having set up a tie under the terms of the act, the Supreme Court broke the tie by looking to the "parties' intentions as manifested in the surrogacy agreement." (*Id.* at p. 93.)

As our exegesis of *Johnson* in *Moschetta* tried to show, the court did not go so far as to hold the surrogacy agreement was "enforceable per se." (See *In re Marriage of Moschetta, supra,* 25 Cal.App.4th at p. 1230). Rather, such a contract was "a proper basis on which to *ascertain the intent*" of the parties. (*Ibid.,* original italics.)

The remarkable thing about this case is that, unless a court is to hold that the surrogate Pamela is the natural mother of the child, Jaycee has no legal parents at all. Her genetic parents are anonymous and will probably not be held to be her natural parents. (See Fam. Code, § 7613, subd. (b).)[3] And Pamela, the so-called surrogate mother who could establish parenthood under the Uniform Parentage Act, never contemplated keeping the child.

---

[3]This statute provides that the donor of semen provided to a licensed physician for use in artificial insemination of a woman other than the donor's wife is treated in law as if he were

Holding that Pamela, the birth mother, is the natural mother (and thereby, by extension, holding that John cannot be the father) is unlikely to comport with the ultimate result in this case. As our Supreme Court pointed out in *Johnson*, to rule that the birth mother in a gestational surrogacy arrangement is the natural mother is to burden her with "responsibilities" she never contemplated and is directly "contrary to her expectations." (*Johnson* v. *Calvert*, *supra*, 5 Cal.4th at p. 94.) We decline—particularly at this early stage of the litigation—to reach a result contrary to her and all the parties' expressed intentions. The *Johnson* court underscored the importance of intentions on page 94 of the opinion, where it quoted from a law review article which advocated their *presumptive* importance. (*Ibid.*, quoting Shultz, *Reproductive Technology and Intent-Based Parenthood: An Opportunity for Gender Neutrality* (1990) Wis. L.Rev. 297, 323 [" 'intentions that are voluntarily chosen, deliberate, express and bargained-for ought presumptively to determine legal parenthood' " (fn. omitted)].)

Pamela is *not* like a natural mother who gives her child up for adoption, but at the last moment the prospective adoptive parents back out. She carried a child that would not have been conceived but for the contract with the intended parents.

While the precise question of gestational surrogacy where the intended parents are not genetically related to the child was not directly before it, the *Johnson* court *did* foresee such a possibility. On pages 94 and 95 of the opinion, the court noted there might be an "extremely rare situation in which neither the gestator nor the woman who provided the ovum for fertilization is willing to assume custody of the child after birth." That is quite literally the situation before us now. And what was the Supreme Court's answer? *To look to the intention of the parties.*

"In what we must hope will be the extremely rare situation in which neither the gestator nor the woman who provided the ovum for fertilization is willing to assume custody of the child after birth, a rule recognizing the intending parents as the child's legal, natural parents should best promote certainty and stability for the child." (*Johnson* v. *Calvert*, *supra*, 5 Cal.4th at pp. 94-95.)

■ As indicated above, the primary issue that will need to be decided is whether Jaycee is John's child so that he will be obligated to support her under Family Code section 3900. Given the Supreme Court's statement about the importance of looking to the intention of the parties in a situation

---

*not* the father of the child. We are hard pressed to think of any reason a woman in an analogous situation should be treated differently.

where neither "mother" (as the term is employed in the Uniform Parentage Act) wants the child, the most likely *legal* result based on the undisputed fact of John's signing the surrogacy agreement is that John will be held to be Jaycee's father. While we need not finally decide the issue now, it is enough that John admits he signed the surrogacy agreement which, for all practical purposes, *caused* Jaycee's conception every bit as much as if he had caused her birth the old fashioned way. As the Supreme Court said in *Johnson*, "But for their acted-on intention, the child would not exist." (5 Cal.4th at p. 93.) As we pointed out in *Moschetta,* the child "would never have been born" except for the surrogacy agreement. (*In re Marriage of Moschetta, supra,* 25 Cal.App.4th at p. 1235.)

To take our cue from *Carbone* and *Bancroft*, we do not "so conclusively establish" that John is Jaycee's parent under Family Code section 3900 at this juncture in the litigation. But there *is* enough in the existing law as declared in the *Johnson* case that we can firmly say that John's signing the surrogacy agreement does show, "by a preponderance of the evidence," that he will likely be held to be Jaycee's father. The family law court has as much jurisdiction to make a pendente lite support order in this case as the courts did in *Carbone* and *Bancroft.*

## IV.  DISPOSITION

Peremptory writs in the first instance are not favored. (See *Alexander* v. *Superior Court* (1993) 5 Cal.4th 1218, 1222-1223 [23 Cal.Rptr.2d 397, 859 P.2d 96].) The "accelerated procedure" described in *Palma* v. *U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171 [203 Cal.Rptr. 626, 681 P.2d 893] of inviting informal responses to the petition and then acting on the petition, is the " 'exception; it should not become routine. Generally, that procedure should be adopted only when petitioner's entitlement to relief is so obvious that no purpose could reasonably be served by plenary consideration.' " (*Alexander, supra,* 5 Cal.4th at p. 1223, quoting *Ng* v. *Superior Court* (1992) 4 Cal.4th 29, 35 [13 Cal.Rptr.2d 856, 840 P.2d 961].)

Then again, as *Ng* pointed out, "unusual urgency," otherwise described as "compelling temporal urgency" (see *Ng* v. *Superior Court, supra,* 4 Cal.4th at p. 35) can justify the accelerated procedure, as long as the law and facts mandating the relief sought are "entirely clear." (*Ibid.*)

The unique (a word which, given the facts before us, seems rather understated) facts of the present case present us with a dilemma. The facts and the law are *almost*, but not quite, "entirely clear." This is, after all, a case of first impression coming to us at the very inception of the litigation. We

must admit that the "entirely clear" standard laid down in *Alexander* and *Ng* justifying the issuing of a peremptory writ in the first instance is not *quite* met. Nevertheless, we think the facts are close enough to justify relief outside the "normal writ procedure." (See *Alexander* v. *Superior Court*, *supra*, 5 Cal.4th at p. 1223.)

First, we obviously have extreme urgency: *a child needs support.* It is important to note the time pressure under which we receive this writ. To issue an alternative writ and require the additional briefing which the normal procedure calls for could delay resolution of the narrow issue before us for several months, and those are several months in which Jaycee will be without the benefit of a support order and during which the parties will be uncertain about whether a support order can even be obtained.

A related aspect of the urgency in this case is that the law should not afford an incentive to a party to a surrogacy contract to avoid the parental responsibilities contemplated by that very contract because of the process of litigation itself. There should be no incentive for recalcitrant "intended parents" in John's situation to delay the possibility of the establishment of a support order by the more lengthy normal writ procedure with its attendant delay. To reiterate: Jaycee cannot wait for the slow, deliberative processes of the judicial system to ponder a case of first impression.

Second, while the entitlement to the relief is not "entirely" clear, the entitlement is as reasonably clear as one might hope for in a case of first impression. Given the language on pages 94 and 95 of the *Johnson* opinion which contemplates pretty much the exact situation before us, it seems that the law is clear enough that John will probably be ultimately held to be Jaycee's father. Whether, after a full and complete study of the subject, the court having the last word on the subject ultimately agrees, is not relevant at the moment.

Finally, there is a clear fail-safe mechanism built into the procedural posture of the case as it now stands. Further considerations relating to the problem of who is Jaycee's parent under Family Code section 3900 may still be presented at the order to show cause hearing. Our ruling today is an extremely narrow one: we merely hold that the fact John signed the surrogacy agreement in the circumstances of this case is enough to give the family court jurisdiction to hear the order to show cause. John may still separately appeal from any order made if he is aggrieved by it, and then this court, or the Supreme Court, will contemplate the subject in more leisurely circumstances. (See *Carbone* v. *Superior Court, supra*, 18 Cal.2d at p. 772 ["The application is determined upon a record of its own and results in an

appealable judgment independent of the final judgment in the action."].) On top of that, he will also be able to appeal any final adjudication that he is Jaycee's father.

Let a peremptory writ issue directing the family law court to hold a hearing forthwith on Luanne's order to show cause for temporary child support and issue an appropriate child support order. To prevent frustration of the relief granted, this opinion shall be final as to this court five days from the date of filing. (Cal. Rules of Court, rule 24(d).)

Once again, the need for legislation in the surrogacy area is apparent. (See *In re Marriage of Moschetta*, *supra*, 25 Cal.App.4th at p. 1235.) We reiterate our previous call for legislative action.

Crosby, J., and Wallin, J., concurred.

A petition for a rehearing was denied February 15, 1996, and the petition of real parties in interest for review by the Supreme Court was denied May 1, 1996.