923 A.2d 115

**In re ROBERTO d.B.**

**No. 110, Sept. Term, 2002.**

Court of Appeals of Maryland.

May 16, 2007.

Dorrance D. Dickens (Deborah Y. Luxenberg, Luxenberg, Johnson & Dickens, P.C., Washington, DC, on brief), for appellant.

No argument on behalf of appellee.

Argued before BELL, C. J., ELDRIDGE,* RAKER, WILNER,* CATHELL, HARRELL, BATTAGLIA, JJ.

---

* Eldridge, J. and Wilner, J., now retired, participated in the hearing and conference of this case while active members of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, they also participate d in the decision and adoption of this opinion.

BELL, C.J.

This case compels the Court to consider the ever-continuing development of artificial reproductive technologies. In the last two decades, methods of producing a child have advanced beyond the traditional realm. In a traditional surrogacy context, the egg donor, who is also the carrier of the child, or the "gestational carrier," is artificially inseminated with the sperm of the intended father, carries the child to term, and then relinquishes parental rights after birth, with the father acknowledging paternity and taking custody of the child; his spouse typically adopts the child. *In re Marriage of Moschetta*, 25 Cal.App.4th 1218, 30 Cal.Rptr.2d 893, 894 (1994). In a gestational surrogacy context, the donated egg begins outside of the gestational carrier, who is impregnated with a fertilized embryo, often as a result of *in vitro* fertilization of the egg of the intended mother with the sperm of the intended father. *See, e.g., Belsito v. Clark*, 67 Ohio Misc.2d 54, 644 N.E.2d 760 (1994); *Johnson v. Calvert*, 5 Cal.4th 84, 19 Cal.Rptr.2d 494, 851 P.2d 776, 778 (1993), *cert. denied*, 510 U.S. 874, 114 S.Ct. 206, 126 L.Ed.2d 163 (1993); *Soos v. Superior Court*, 182 Ariz. 470, 897 P.2d 1356 (1994). The gestational surrogacy context can involve anonymous sperm and egg donors, with the result that the child has no genetic relation to the gestational carrier or the intended parents. *In re Marriage of Buzzanca*, 61 Cal.App.4th 1410, 72 Cal.Rptr.2d 280 (1998); *Jaycee B. v. Superior Court*, 42 Cal.App.4th 718, 49 Cal.Rptr.2d 694, 695 (1996).

The law is being tested as these new techniques become more commonplace and accepted; this case represents the first challenge in Maryland. The case *sub judice* presents a novel question of law, one of first impression in this Court: must the name of a genetically unrelated gestational host of a fetus, with whom the appellant contracted to carry *in vitro* fertilized embryos to term, be listed as the mother on the birth certificate, when, as a result, children are born? The Circuit Court for Montgomery County held that it must. We shall reverse.

## A.

Because of the unusual procedural posture of this case, the facts are not disputed. The appellant, Roberto d.B., an unmarried male, initiated, on December 18, 2000, a medical procedure known as *in vitro* fertilization, with his sperm being used to fertilize eggs from an egg donor. The procedure resulted in two fertilized eggs.

The putative appellee in this case is the woman with whom the appellant contracted to act as a carrier for any embryo that might be created as a result of his fertilization efforts so that they might gestate in a womb. Fertilized eggs were implanted in the appellee on December 21, 2000, and she delivered twin children on August 23, 2001, at Holy Cross Hospital in Silver Spring, Maryland.

The medical records department of a hospital in Maryland is required to submit information regarding births to the Maryland Division of Vital Records[1] ("MDVR"), a part of the Maryland Vital Statistics Administration. Maryland Code (1982, 2005 Repl.Vol., 2006 Supp.) § 4–208(a)(4)(iii) of the Health–General Article ("HG").[2] The MDVR, having received

---

1. The Maryland Division of Vital Records, a division of the Maryland Vital Statistics Administration, according to its website, issues certified copies of birth, death, fetal death, and marriage certificates for events that occur in Maryland, provides divorce verifications, and provides information on procedures to follow for registering an adoption, legitimation, or an adjudication of paternity.

2. Maryland Code (1982, 2005 Repl.Vol., 2006 Supp.) § 4–208 of the Health–General article provides, as relevant:

"(a)
(1) Within 72 hours after a birth occurs in an institution, or en route to the institution, the administrative head of the institution or a designee of the administrative head shall:
"(i) Prepare, on the form that the Secretary provides, a certificate of birth;
"(ii) Secure each signature that is required on the certificate; and File the certificate.
"(2) The attending physician shall provide the date of birth and medical information that are required on the certificate within 72 hours after the birth.

this information, issues the birth certificates. Unless a court order otherwise provides, the hospital will report the gestational carrier as the "mother" of the child to the MDVR. HG § 4–208. Holy Cross Hospital followed this procedure.

Neither the appellee nor the appellant, however, wanted the gestational carrier's name to be listed on the birth certificate as the "mother" of the children. It is the appellant's and the appellee's contention that the appellee was merely acting as a gestational carrier for children that were never intended, by either party, to be hers, and to whom she has no genetic

"(3) The results of the universal hearing screening of newborns shall be incorporated into the supplemental information required by the Department to be submitted as a part of the birth event.

"(4) *Upon the birth of a child to an unmarried woman in an institution, the administrative head of the institution or the designee of the administrative head shall:*

"*(i) Provide an opportunity for the child's mother and the father to complete a standardized affidavit of parentage recognizing parentage of the child on the standardized form provided by the Department of Human Resources under § 5–1028 of the Family Law Article;*

"(ii) Furnish to the mother written information prepared by the Child Support Enforcement Administration concerning the benefits of having the paternity of her child established, including the availability of child support enforcement services; and

"(iii) Forward the completed affidavit to the Department of Health and Mental Hygiene, Division of Vital Records. The Department of Health and Mental Hygiene, Division of Vital Records shall make the affidavits available to the parents, guardian of the child, or a child support enforcement agency upon request.

" "(5) An institution, the administrative head of the institution, the designee of the administrative head of an institution, and an employee of an institution may not be held liable in any cause of action arising out of the establishment of paternity.

" "(6) If the child's mother was not married at the time of either conception or birth or between conception and birth, the name of the father may not be entered on the certificate without an affidavit of paternity as authorized by § 5–1028 of the Family Law Article signed by the mother and the person to be named on the certificate as the father.

"(7) In any case in which paternity of a child is determined by a court of competent jurisdiction, the name of the father and surname of the child shall be entered on the certificate of birth in accordance with the finding and order of the court.

"(8) If the father is not named on the certificate of birth, no other information about the father shall be entered on the certificate."
(Emphasis added).

relationship. The appellee does not wish to exercise parental rights to, or over, these two children, nor does the appellant desire that she do so. The appellee contends that, under her agreement, she had a reasonable expectation that her role in the lives of these children would terminate upon delivery of the children, and that the faithful performance of her duties under the agreement would not permanently impact her life, nor the lives of her family.

Thus, the appellee joined the appellant's petition to the Circuit Court for Montgomery County, asking it to issue an "accurate" birth certificate, i.e., one that did not list the gestational carrier as the children's mother. In the petition, they asked the court to declare that the appellant was the father of the children, and authorize the hospital to report only the name of the father to the MDVR.

Despite the contentions of the appellant and appellee, the Circuit Court for Montgomery County refused to remove the appellee's name from the birth certificate and rejected the petition.[3] The appellant noted an appeal to the Court of Special Appeals. On our own motion and prior to proceedings in that court, this Court granted certiorari. *In re Roberto d.B.*, 372 Md. 684, 814 A.2d 570 (2003).

### B.

The appellant is the genetic father of the twin children, having provided his sperm to fertilize donated eggs. The egg donor, not a party in this case, is the genetic provider of the egg. The appellee is the gestational carrier of the fertilized eggs that developed in her womb, despite contributing no genetic material to the fertilization process.

---

**3.** On August 29, 2001, the same Circuit Court for Montgomery County denied the appellant's Petition for Determination of Parentage and Issuance of Accurate Certificates of Birth. In that petition, the appellant asked the surrogate carrier's name be removed from the birth certificate. The denial, which is appealed in this case, occurred on July 9, 2002, and reaffirmed the earlier August 2001 denial.

■ The Circuit Court's oral ruling is sparse, but outlines two primary reasons why the name of the gestational carrier should not be removed from the children's birth certificate. It first notes that no Maryland case law exists that would give a trial court the power to remove the mother's name from a birth certificate. Second, it notes that removing the name of the surrogate from the birth certificate is inconsistent with the "best interests of the child" standard ("BI C"), citing, generally, "health reasons."[4]

### 1.

■ The appellant's primary contention is that the parentage statutes in Maryland, as enforced by the trial court below, do not "afford equal protection of the law to men and women similarly situated." Maryland's Equal Rights Amendment (E.R.A.), Article 46 of the Maryland Declaration of

---

**4.** We note that the Circuit Court also stated that "[t]his is not an appropriate issue for adoption," without providing any reasons for why not. Section 4–211 of the Health General Article provides that a new birth certificate can issue where "[a] court of competent jurisdiction has entered an order as to the parentage, legitimation, or *adoption* of the individual." (Emphasis added). There is no reason why a trial court, in appropriate adoption proceedings, could not order the issuance of a new birth certificate without naming a "mother."

The Circuit Court also noted that there are "health reasons" why the gestational carrier's name should remain on the birth certificate, even if her parental rights are relinquished. This makes little sense. The father in this case could, and presumably does, have all the pertinent health records related to the child's birth. This is especially the case where neither the gestational carrier nor the egg donor is unknown to the father, as in this case. If necessary, the father could easily provide these documents to the hospital, to the child, or to third parties.

The court also reasoned, "[t]here is an abundant precedent for using the genetics test for identifying a natural parent," relying on *Belsito v. Clark*, 67 Ohio Misc.2d 54, 644 N.E.2d 760, 766 (1994). *Belsito* dealt with determining whose name belonged on the birth certificate when two candidates existed, the gestational carrier and the egg donor. The court resolved the dispute by employing a newly formed "intent" test to determine who the "mother" should be. 644 N.E.2d at 767. Because we do not attempt to redefine what a "mother" is in this case, *Belsito* has little applicability. In any event, we reject its rationale for determining who a "mother" is, that intent is the dispositive factor in the parentage determination.

Rights, specifies that "[e]quality of rights under the law shall not be abridged or denied because of sex." The appellant contends that because Maryland's parentage statutes allow a man to deny paternity, and do not, currently, allow a woman to deny maternity, these statutes, unless interpreted differently, are subject to an E.R.A. challenge.

The paternity statute in Maryland, codified as Maryland Code (1999, 2006 Repl. Vol.) §§ 5–1001 *et seq.* of the Family Law Article, outlines the steps and processes through which the state can establish paternity, and thus hold alleged fathers responsible for parental duties, such as child support. It is also the statute that allows alleged fathers to deny paternity.

Section 5–1002 [5] outlines the legislative purpose of the statute, providing that "this State has a duty to improve the deprived social and economic status of children born out of wedlock," and that its goals are "to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock," and "to impose on the mothers and fathers of children born out of

---

**5.** Section 5–1002 provides:

" § 5–1002.   Legislative findings;   purpose
"In general
"(a) The General Assembly finds that:
"(1) this State has a duty to improve the deprived social and economic status of children born out of wedlock;  and
"(2) the policies and procedures in this subtitle are socially necessary and desirable.
"Purpose
"(b) The purpose of this subtitle is:
"(1) to promote the general welfare and best interests of children born out of wedlock by securing for them, as nearly as practicable, the same rights to support, care, and education as children born in wedlock;
"(2) to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood;  and
"(3) to simplify t he procedures for determining paternity, custody, guardianship, and responsibility for the support of children born out of wedlock.
"Scope of subtitle
"(c) Nothing in this subtitle may be construed to limit the right of a putative father to file a complaint to establish his paternity of a child.

wedlock the basic obligations and responsibilities of parenthood."

To establish paternity, a proceeding must be brought before a child's eighteenth birth day,[6] and shall be filed either by the mother or by a third party if the mother is deceased or otherwise unable or unwilling to file such a complaint.[7] A blood test may be requested in conjunction with the proceeding,[8] and, at trial, the burden is on the complainant to prove that the "alleged father is the father of the child." [9] If,

---

6. Maryland Code (1999, 2006 Repl.Vol.) § 5–1006 of the Family Law Article provides, as relevant:

"(a) A proceeding to establish paternity of a child under this subtitle may be begun at any time before the child's eighteenth birthday."

7. Maryland Code (1999, 2006 Repl.Vol.) § 5–1010 of the Family Law Article provides, as relevant:

"(d)

"(1) Except as otherwise provided in this subsection, a complaint filed under this subtitle shall be supported by the oath of the mother or pregnant woman, whether or not she is a party to the paternity proceeding.

"(2) The complaint may be filed without the oath if the mother or pregnant woman:

"(i) is dead;

"(ii) refuses to file a complaint;

"(iii) refuses to disclose the identity of the father of the child;

"(iv) is mentally or physically incapable of making an oath; or

"(v) refuses to make the oath.

"(3) If the complaint is filed without an oath under paragraph (2) of this subsection:

"(i) the complainant shall verify the fact of the pregnancy or birth; and

"(ii) if the mother or pregnant woman is living, she shall be made a defendant.

8. Maryland Code (1999, 2006 Repl.Vol.) § 5–1021 of the Family Law Article provides:

" § 5–1021.   Blood or genetic test

"(a) In connection with a pretrial inquiry under this subtitle, the State's Attorney may request any individual summoned to the pretrial inquiry to submit to a blood or genetic test.

"(b) If the individual refuses the State's Attorney's request to submit to a blood or genetic test, the State's Attorney may apply to the circuit court for an order that directs the individual to submit to the test."

9. Maryland Code (1999, 2006 Repl.Vol.) § 5–1027 of the Family Law Article provides, as relevant:

however, the trial court finds that the alleged father is the father, then it shall declare paternity.[10] Section 5–1028 of the Family Law Article details that an unmarried father and mother "shall be provided an opportunity to execute an affidavit of parentage" as provided for under HG 4–208. If the trial court, however, finds that the alleged father is *not* the father, it can set aside or modify the declaration of paternity.[11] Thus, the court has the power to declare that an alleged father has no paternal status when no genetic connection is found.

The appellant argues that a woman has no equal opportunity to deny maternity based on genetic connection—in essence, that in a paternity action, if no genetic link between a man and a child is established, the man would not be found to be the parent, and the matter would end, but a woman, or a gestational carrier, as in this case, will be forced by the State to be the "legal" mother of the children, despite her lack of genetic connection.

The appellant offers that, under his interpretation of the parentage statutes, the E.R.A. problem is avoided, "because a non-genetic gestational carrier could apply to the court for a parentage order and receive one upon a showing that she was

---

"At the trial, the burden is on the complainant to establish by a preponderance of the evidence that the alleged father is the father of the child."

**10.** Maryland Code (1999, 2006 Repl.Vol.) § 5–1032 of the Family Law Article provides, as relevant:

"If the court finds that the alleged father is the father, the court shall pass an order that ... declares the alleged father to be the father of the child ..."

**11.** Maryland Code (1999, 2006 Repl.Vol.) § 5–1038 of the Family Law Article provides, as relevant:

"5–1038. Finality of orders; modification

"(a)

      *    *    *

"(2)(i) A declaration of paternity may be modified or set aside:

      *    *    *

"2. if a blood or genetic test ... establishes the exclusion of the individual named as the father in the order."

not genetically related to the child and never intended to be its parent."

■ Maryland law currently accommodates, if not contemplates, a birth certificate on which the mother is not identified. Thus, the trial courts may pass such an order. Maryland Code (1982, 2005 Repl.Vol., 2006 Supp.) § 4–211 of the Health–General Article details the process through which the "Authorization of new certificates of birth" may be obtained. It provides, as relevant:

"(a) Except as provided in subsection (c) of this section, the Secretary shall make a new certificate of birth for an individual if the Department receives satisfactory proof that:

"(1) The individual was born in this State; and

"(2) Regardless of the location, one of the following has occurred:

"(i) The previously unwed parents of the individual have married each other after the birth of the individual;

"(ii) A court of competent jurisdiction has entered an order as to the *parentage*, legitimation, or adoption of the individual; or

"(iii) If a father is not named on an earlier certificate of birth:

"1. The father of the individual has acknowledged himself by affidavit to be the father; and

"2. The mother of the individual has consented by affidavit to the acknowledgment."

(Emphasis added). The appellant contends that, because the statute controlling new birth certificates only addresses "parentage," without limitation to as to which, in the abstract, it does not preclude the courts from issuing an order authorizing a birth certificate that does not list the mother's name.[12] We

---

12. We note that § 4–211(a)(2)(iii) allows for a new birth certificate to be issued when a man is later determined, as a result of a paternity action, to be the father of a child. Under the provisions set forth in this case, a later-determined mother's name could also be added to the certificate.

agree; the only matter remaining is construing the parentage statutes in a way that affords women the same opportunity to deny parentage as men have.

The paternity statute was added to the Family Law Article in 1984. *See* Acts of 1984, chapter 296, § 2. Judging from language the Legislature used in drafting the statute, the Legislature did not contemplate anything outside of traditional childbirth. For example, § 5–1027 of the Family Law Article provides, "[t]here is a rebuttable presumption that the child is the legitimate child of the man to whom its mother was married at the time of conception," and the legislative purpose of the statute purports to be to aid "children born out of wedlock." The statute does not provide for a situation where the potential parents are unmarried, much less a situation where children are conceived using an assisted reproductive technology.

What had not been fathomed exists today. The methods by which people can produce children have changed; the option of having children is now available, using these methods, to people who, otherwise, would not be able to have children. Whether the reasons for not producing a child in the traditional sense are biological or not, adoption is no longer the only option. One can certainly imagine a married couple that is infertile, but wishes to have children of their own genetic makeup. Assisted reproductive technologies allow for that to occur. The paternity statute, clearly, did not contemplate the many potential legal issues arising from these new technologies, issues that will continue to arise unless the laws are rewritten or construed in light of these new technologies. As it exists, the paternity statute serves to restrict, rather than protect, the relationships the intended parents wish to have with children conceived using these new processes.

Again, the paternity statute, as written, provides an opportunity for genetically unlinked males to avoid parentage, while genetically unlinked females do not have the same option. This Court has found that any action by the State, without a substantial basis,[13] that imposes a burden on, or grants a

---

**13.** This Court has applied a strict scrutiny standard when reviewing gender-based discrimination claims. *See, e.g., Giffin v. Crane,* 351 Md.

benefit to one sex, and not to the other, violates the Maryland Equal Rights Amendment. *Giffin v. Crane,* 351 Md. 133, 149, 716 A.2d 1029, 1037 (1998). There, where the parents of two girls separated, the two girls remained with the father, with the mother maintaining regular visitation until moving to another state a year later. 351 Md. at 135, 716 A.2d at 1030. In the divorce proceedings, both parties asked for custody, support, and attorney's fees. 351 Md. at 135, 716 A.2d at 1030. Custody and visitation were resolved by written agreement that detailed that there would be joint legal custody of the children, but that physical custody would remain with the father. 351 Md. at 135–136, 716 A.2d at 1030–1031. The agreement also contemplated the possibility of annual reviews of the residential status of the children, to be conducted, at the requesting party's expense, by a mental health professional selected by the parties. 351 Md. at 136, 716 A.2d at 1031. After one such investigation, the mental health professional recommended that custody be changed from the father to the mother, citing an emotional need of girls. 351 Md. at 137, 716 A.2d at 1031. By the time the review had been completed, all other issues, including child support, had been settled. 351 Md. at 138, 716 A.2d at 1032. After the father refused to accept the health professional's recommendation, the mother filed a petition to modify custody and for child support. 351 Md. at 138, 716 A.2d at 1032.

The trial court granted the change in custody, commenting that:

---

133, 150, 716 A.2d 1029, 1037 (1998) (holding that the Equal Rights Amendment flatly prohibits gender-based classifications, absent substantial justification); *State v. Burning Tree Club, Inc.,* 315 Md. 254, 294, 554 A.2d 366, 386 (1989) (holding that the burden of justifying gender classifications falls upon the State, and that the level of scrutiny to which the classifications are subject is "at least the same scrutiny as racial classifications"); *Rand v. Rand,* 280 Md. 508, 512–514, 374 A.2d 900, 903–904 (1977) (finding instructive, in interpreting the breath of Maryland's Equal Rights Amendment as it applied to sex discrimination, the Supreme Court of Washington's "overriding compelling state interest" standard, and the Illinois Supreme Court's "strict judicial scrutiny" standard).

"[T]he Court gleans ... a girl child having particular need for her mother has seemed to come to the fore and is a necessary factor in my determinations in this case.

"The Court feels that the best interests of the children and the material change of circumstances, as exemplified by the reaching an age where [the child] at the very least exemplifies a need for a female hand, causes the Court to come to the conclusion that the children should reside with their mother."

351 Md. at 140–141, 716 A.2d at 1033.

In his appeal to the Court of Special Appeals, the father argued that the trial court erred by considering the sex of the parents as a factor in its custody determination. 351 Md. at 141, 716 A.2d at 1033. The Court of Special Appeals, in an unreported opinion, held that "[t]he consideration of gender was a valid consideration in determining residential custody in this case." 351 Md. at 141, 716 A.2d at 1034.

This Court, having decided the ultimate question to be whether, in a child custody proceeding, the sex of the parent is a legitimate and proper consideration in determining which of them is the appropriate residential custodian, held:

"The basic principle of the Maryland Equal Rights Amendment, thus, is that sex is not a permissible factor in determining the legal rights of women, or men, so that the treatment of any person by the law may not be based upon the circumstance that such person is of one sex or the other ... that amendment generally invalidates governmental action which imposes a burden on, or grants a benefit to, one sex but not the other one.

\*　　\*　　\*　　\*　　\*　　\*

"[T]he equality between the sexes demanded by the Maryland Equal Rights Amendment focuses on 'rights' of individuals 'under the law,' which encompasses all forms of privileges, immunities, benefits and responsibilities of citizens.... As to these, the Maryland E.R.A. absolutely forbids the determination of such 'rights,' as may be accorded by law, solely on the basis of one's sex, i.e., sex is an

> impermissible factor in making any such determination....
> the Equal Rights Amendment's guarantee of equality of
> rights under the law 'can only mean that sex is not a
> factor.' "

351 Md. at 148–149, 716 A.2d at 1037 (citations omitted). Vacating the judgment of the intermediate appellate court, this Court concluded that the Equal Rights Amendment "prohibits gender based classifications, absent substantial justification, whether contained in legislative enactments, governmental policies, or by application of common law rules." 351 Md. at 149, 716 A.2d at 1037.

Other Maryland cases reflect the application of the Amendment's intent. *See Burning Tree Club v. Bainum,* 305 Md. 53, 501 A.2d 817 (1985) (holding that the E.R.A. drastically altered traditional views of the validity of sex-based classifications imposed under the law, and was cogent evidence that the people of Maryland were fully committed to equal rights for men and women); *Rand v. Rand,* 280 Md. 508, 374 A.2d 900 (1977) (holding that the common law rule placing primary liability for the support of minor children on the father was irreconcilable with the E.R.A., and noting that the "parental obligation for child support ... is one shared by both parents"); *Kline v. Ansell,* 287 Md. 585, 414 A.2d 929 (1980) (holding that a common law rule that only men could sue or be sued for criminal conversation violated the E.R.A.); *Condore v. Prince George's Co.,* 289 Md. 516, 425 A.2d 1011 (1981) (holding that the common law doctrine of necessaries, which obligated the husband, but not the wife, to pay for his spouse's necessaries, violated the E.R.A.); *Turner v. State,* 299 Md. 565, 474 A.2d 1297 (1984) (holding that a criminal statute which prohibited the employment by taverns of females, but not males, violated the E.R.A.); *Elza v. Elza,* 300 Md. 51, 475 A.2d 1180 (1984) (abolishing the maternal preference doctrine, holding that "neither parent shall be given preference solely because of his or her sex"). These rulings reflect this Court's understanding that both mothers and fathers will be provided equal treatment under the law, and that neither will be shown preference simply because of his or her sex or familial role.

Because Maryland's E.R.A. forbids the granting of more rights to one sex than to the other, in order to avoid an equal rights challenge, the paternity statutes in Maryland must be construed to apply equally to both males and females.[14] This Court has long held that a statute will be construed to avoid a conflict with the Constitution whenever that course is possible. *Deems v. Western Maryland Ry. Co.*, 247 Md. 95, 102, 231 A.2d 514, 518 (1967). *See also R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc.*, 382 Md. 689, 718, 857 A.2d 1, 18 (2004) (stating that a court will, whenever reasonably possible, construe and apply a statute to avoid casting serious doubt upon its constitutionality); *Harryman v. State*, 359 Md. 492, 509, 754 A.2d 1018, 1027 (2000) (holding that an interpretation of a statute which raises doubts as to its constitutionality should be avoided if the language of the statute permits); *Curran v. Price*, 334 Md. 149, 172, 638 A.2d 93, 104 (1994) (holding that if a statute is susceptible to two reasonable interpretations, one

---

**14.** The appellant offers additional arguments that we need not address to resolve this case. He first argues that it is important to define the term "parent," correctly. The appellant focuses, in turn, on how the courts should define the word "mother" in light of developing technologies, noting:

"[I]n this case, the gestational carrier who actually gave birth to the children is not genetically related to the children in any way, but might be considered the birth mother. And the person who is, in fact, genetically related to the children, and might be considered the mother of the children under a genetic definition of the term, is not listed anywhere. So, who actually belongs on the birth certificate as mother depends entirely on the definition accorded to the term."

The appellant next asserts that under Maryland law, the birth certificate establishes legal, not scientific, facts, regarding an individual's birth. He reasons:

"The chief function of the birth certificate is to record the circumstances of an individual's birth. . . . The secondary function of the birth certificate is to establish the legal circumstances of an individual's birth. Under the statute, the names of natural (genetic) parents may[be] removed [and] the names of the adoptive parents inserted in their place. As such, the document tells the state and public institutions to whom they may look for the support of the child, for permission in the case of a minor, for inquiry in matters concerning the child."

The resolution of this case does not require that we re-define the term, "mother," nor is there any dispute as to the purpose of the birth certificate.

of which would involve a decision as to its constitutionality, the preferred construction is the one which avoids the constitutional question); *Davis v. State*, 294 Md. 370, 377, 451 A.2d 107, 111 (1982) (holding that a construction of a statute giving rise to doubts as to its constitutionality should be avoided if the language permits); *District Land Corp. v. Washington Suburban Sanitary Comm'n*, 266 Md. 301, 312, 292 A.2d 695, 701 (1972) (holding that when two constructions of statutory language are possible, courts will avoid the construction that makes the provision illegal and nugatory); *Barrett v. Clark*, 189 Md. 116, 127, 54 A.2d 128, 133 (1947) (holding that where a statute, susceptible to two possible constructions, has doubtful constitutionality, courts will adopt that view of the enactment that avoids fundamental objections).

The language of the paternity statute need not be rewritten. Interpreting the statute to extend the same rights to women and maternity as it applies—and works quite well—to men and paternity is all that is required.[15]

---

**15.** Judge Cathell's dissent correctly notes that this case illustrates how new reproductive technologies have produced situations virtually inconceivable decades ago. *In Re Roberto*, 399 Md. 267, 295, 923 A.2d 115, 132 (2007) (Cathell, J., dissenting). He feels, however, that the majority's decision to address one of these situations opens the floodgate to a number of moral problems, ones best left to the Legislative Branch to address. 399 Md. at 295, 923 A.2d at 132 (Cathell, J., dissenting). Needless to say, we do not agree.

Primarily, his dissent seems concerned that this opinion creates an "intent" test. The dissent feels that, because the gestational carrier in this case has requested to have her name removed from the birth certificate without challenging, in the same manner a man might in a paternity suit, that the genetic material used to create the child is actually hers, this opinion allows a woman to challenge maternity because she did not "intend" to be a mother. 399 Md. at 298, 923 A.2d at 133–34 (Cathell, J., dissenting). Thus, Judge Cathell worries that thousands of men now will want to challenge paternity because they did not intend to become fathers.

This opinion does nothing of the sort. The paternity statute, as applied to men, and now, as to women, merely establishes that the process by which men can challenge paternity can now be employed by women. As written, the paternity statute does not explicitly include intent as a factor to be considered. As noted previously, we reject the Circuit Court's reliance on *Belsito, supra*, 67 Ohio Misc.2d 54, 644 N.E.2d 760, which resolved a similar situation by looking at who, as

Furthermore, for reasons discussed in part C. *infra*, because there is sufficient evidence that the State would not object to the removal of the gestational carrier's name from the birth certificate, and because such a result would not be inconsistent with the current statutes controlling the issuance of birth certificates, we hold that it is within a trial court's power to order the MDVR to issue a birth certificate that contains only the father's name.

### 2.

■ The Circuit Court opined that "it is not in the best interests of the minor child [to remove the surrogate mother's name from the birth certificate]." The only explanation it provides, however, is as follows:

"There are a lot of public policy reasons why it is not in the best interests of the child not to have the mother's name on the birth certificate.

"There are health reasons why you might want to have, and it would be good to have the mother's name on the birth certificate, and have that information available."

It is clear, however, that, the trial court's explanation aside, the best interests of the child ("BIC") standard does not apply to the unusual circumstance in the case *sub judice*. While we have noted previously that "the controlling factor in adoption and custody cases is . . . what best serves the interest of the child," *In re Adoption/Guardianship No. 10941*, 335 Md. 99, 113, 642 A.2d 201, 208 (1994), it is clear that the context in which the issue arises is significant in determining the standard by which to evaluate the situation.

In family law cases, courts will employ the BIC standard in their analysis when there is a dispute concerning custody of

---

between the egg donor and the gestational carrier, was "intended" to be the mother. *See* note 4, *supra* at 6. This opinion does not create an "intent" test for women.

This opinion does not attempt to predict the future of reproductive technologies, it does not attempt to write policy on the topic of surrogacy, and it does not define what a "mother" is.

the child by opposing parents or third parties. This Court, for example, has stated previously:

"A court faced with a question of child custody upon the separation of the parents may continue the joint custody that has existed in the past, or award custody to one of the parents, or to a third person, depending upon what is in the *best interest of the child.*"

*Taylor v. Taylor,* 306 Md. 290, 301, 508 A.2d 964, 969 (1986) (emphasis added). The use of the BIC standard is highly dependent on the circumstances surrounding the case; that is, the BIC standard is not always applied uniformly or in the same way, even when the case involves parental rights of some sort. For example, in cases involving the surname of a child and a dispute by the parents over that name, two different standards are applied under two similar, yet separate, circumstances. Compare *Schroeder v. Broadfoot,* 142 Md.App. 569, 790 A.2d 773 (2002) with *Dorsey v. Tarpley,* 381 Md. 109, 847 A.2d 445 (2004).

■ As *Schroeder* demonstrates, where the child has "no initial surname," the courts will apply a "pure best interests" standard. There, the Court of Special Appeals, applying this standard, held that a child's best interests were not necessarily served by automatically assuming the father's surname. The case involved two unmarried parents who disagreed as to whose surname the unborn child should assume upon birth. 142 Md.App. at 572, 790 A.2d at 775. After birth, the mother did not report that Broadfoot was the father, so his name was not listed on the child's birth certificate. 142 Md.App. at 572, 790 A.2d at 775. Upon discovering that the mother's surname had been listed on the birth certificate, the father filed a Complaint against the mother; the mother, in turn, filed a Complaint to Establish Paternity, Custody, and Child Support against the father. 142 Md.App. at 571, 790 A.2d at 775. Prior to the paternity action, the father had not acknowledged paternity of the child, but had admitted to that "possibility." 142 Md.App. at 571, 790 A.2d at 775. After blood testing revealed a paternal genetic connection, the father took action

to have the child's surname changed from the mother's last name, "Schroeder," to his own, "Broadfoot." 142 Md.App. at 571, 790 A.2d at 775. The father argued, primarily, that the child "will become confused over whether his mother's ex-husband (Brent Schroeder) is his father." 142 Md.App. at 574, 790 A.2d at 776. The Circuit Court agreed. 142 Md.App. at 575, 790 A.2d at 777.

After noting that the proper standard, as established in *Lassiter–Geers v. Reichenbach,* 303 Md. 88, 90, 492 A.2d 303, 304 (1985), was that "when a father and mother of a child fail to agree at birth and continue to disagree upon the surname to be given the child, the question is one to be determined upon the basis of the best interest of the child," the Court of Special Appeals held that "judicial resolution of the name dispute by application of the customary preference for children to bear their father's surnames would violate the Maryland Equal Rights Amendment." 142 Md.App. at 581, 790 A.2d at 781, *citing Lassiter–Geers,* 303 Md. at 94, 492 A.2d at 306. It noted, in that regard:

"A legal presumption that would operate to create a default circumstance in which, absent evidence of abandonment or serious misconduct by the child's father, the child's best interests are deemed to be served by giving him his father's surname, is a gender-based and gender-biased preference that not only is outdated in the law but also would violate the Maryland Equal Rights Amendment."

142 Md.App. at 585–586, 790 A.2d at 783.

Proceeding on those premises, the intermediate appellate court decided that, under the circumstances, a gender neutral, familial role neutral, purely best interest standard would be the most reasonable:

"We conclude that in resolving 'no initial surname' disputes between unmarried parents, just as in resolving those disputes between parents who are or were married, either at conception or at the time of birth, a pure best interests standard applies. Because the matter is one of equity, however, the doctrine of laches applies. Thus, if a father

delays in seeking a determination of paternity, or in asserting his objection to the name the mother has selected for the child, the court may conclude that the father has acquiesced in the mother's naming of the child, and treat his challenge as a request for the child's name to be changed, to which the 'extreme circumstances' standard applies."

142 Md.App. at 587–588, 790 A.2d at 784–785.

The result in *Schroeder* is different from that which this Court reached in *Dorsey*. In that case, there was no paternity dispute; rather, the dispute arose over whether a prior agreement had been reached as to the child's surname. 381 Md. at 112–113, 847 A.2d at 447. This Court addressed the differing standards in "change of name" cases and "no initial name" cases such as *Schroeder*. In *Dorsey*, the child was born to unmarried parents. The father, Tarpley, wanted the child's surname to be changed from the mother's surname, Dorsey, to Dorsey–Tarpley. The mother opposed the change. 381 Md. at 111, 847 A.2d at 446. The trial court granted the father's petition for name change, concluding that it would best serve the interests of the child to allow the name change. 381 Md. at 114, 847 A.2d at 447–448. It based its decision on the child's general interest to have the names of both parents. The court noted, in that regard, that the child's young age was a factor, concluding that "here in a circumstance where there is at least a separation, the child should at least carry the tradition of both families." 381 Md. at 114–115, 847 A.2d at 448. The mother, whose motions for new trial and to alter or amend the judgment had been denied, appealed. 381 Md. at 112, 847 A.2d at 446. She contended that the surname had been agreed to prior to the birth, and that the father had failed to show that the change was in the best interest of the child and that the circumstances were extreme enough to warrant a change. 381 Md. at 112, 847 A.2d at 446.

This Court vacated the judgment. 381 Md. at 115, 847 A.2d at 448. We noted that, in general, parents may chose jointly whatever name they wish for the child's surname, "just as they determine what shall be a child's given name," but, citing *Lassiter–Geers v. Reichenbach*, 303 Md. 88, 94–95, 492 A.2d

303, 306 (1985), neither parent "has a superior right to determine the initial surname their child should bear." 381 Md. at 115, 847 A.2d at 448. Furthermore, we reiterated that, in cases where the child has "no initial name at birth," courts must "look at what is in the best interests of the child before determining if a name change is warranted." 381 Md. at 115–116, 847 A.2d at 448–449, *quoting West v. Wright,* 263 Md. 297, 299, 283 A.2d 401, 402 (1971). We noted, however, that there is a presumption against granting such a change except under "extreme circumstances," 263 Md. at 300, 283 A.2d at 403.[16] As to that, we said, the proponent of the name change has the burden of satisfying the "extreme circumstances" standard, *e.g.,* bad parental behavior. 381 Md. at 116–117, 847 A.2d at 449, *citing Schroeder,* 142 Md.App. at 584, 790 A.2d at 782 (noting that abandonment and serious misconduct disgracing an existing surname are of paramount importance because they "epitomize the sort of exceedingly negative behavior by a parent that will justify changing the child's surname, when the parents gave the child that parent's surname at birth"). In contrast, for "no initial name" cases, where parents have not agreed on a child's surname, the proponent for the name change must demonstrate that it is in the child's best interest under a *Lassiter–Geers* "pure best interests" standard. 381 Md. at 117, 847 A.2d at 449.

■ As *Schroeder* and *Dorsey* illustrate, in parental disputes, the use of the best interests of the child standard is dependent on the circumstances. Where the dispute is between a parent and a non-parent, however, while the "best interests of the child" standard is a factor in the judicial resolution, it is typically not addressed until the parent is found *unfit.* In *McDermott v. Dougherty,* 385 Md. 320, 869 A.2d 751 (2005), we held that:

---

**16.** There were two factors to consider when determining the existence of such circumstances, namely: whether there is any evidence of misconduct by a parent that could make a child's continued use of a parent's name disgraceful, and whether the parent wilfully abandoned or surrendered his or her natural ties to the parent.

"... in disputed custody cases where private third parties are attempting to gain custody of children from their natural parents, the trial court must first find that both natural parents are unfit to have custody of their children or that extraordinary circumstances exist which are significantly detrimental to the child remaining in the custody of the parent or parents, before a trial court should consider the 'best interests of the child' standard as a means of deciding the dispute."

385 Md. at 325, 869 A.2d at 754.

*McDermott* was a custody dispute between the child's natural father, McDermott, and his maternal grandparents, the Dougherty's. 385 Md. at 323–324, 869 A.2d at 753. After the Circuit Court for Harford County found Patrick's mother to be "unfit," it proceeded to find that McDermott's employment as a merchant marine, which required him to spend long intervals at sea, constituted an "exceptional circumstance" as defined in *Ross v. Hoffman,* 280 Md. 172, 191, 372 A.2d 582, 593 (1977). Mindful of, and applying the "best interests of the child" standard, the court concluded that the child Patrick required a more stable living situation. 385 Md. at 324, 869 A.2d at 753. The Circuit Court therefore awarded custody of Patrick to the Dougherty's. 385 Md. at 324, 869 A.2d at 753.

In analyzing this case, we first noted that, in a situation where both parents seek custody, each parent possesses a constitutionally-protected fundamental parental right. 385 Md. at 353, 869 A.2d at 770. Under Maryland Code (1984, 2006 Repl.Vol.) § 5–203(d)(2) of the Family Law Article,[17] we observed, neither parent has a superior right to exercise the right to provide "care, custody, and control" of the children. 385 Md. at 353, 869 A.2d at 770. Because each parent neutralizes the other's right, "the best interests of the child

---

**17.** § 5–203(d)(2) provides that "the parents are the joint natural guardians of their minor child," that they are "jointly and severally responsible for the child's support, care, nurture, welfare, and education," and that they each "have the same powers and duties in relation to the child."

[remains] as the *sole standard* to apply to these types of custody decisions." 385 Md. at 353, 869 A.2d at 770. Where, however, we explained,

"... the dispute is between a *fit parent and a private third party*, ... both parties do not begin on equal footing in respect to rights to 'care, custody, and control' of the children. The parent is asserting a fundamental constitutional right. The third party is not. A private third party has no fundamental constitutional right to raise the children of others. Generally, absent a constitutional statute, the non-governmental third party has no rights, constitutional or otherwise, to raise someone else's child."

385 Md. at 353, 869 A.2d at 770 (emphasis added).

Accordingly, this Court also noted that typically, the "best interests of the child" standard is applied to disputes between natural fit parents, "most often aris[ing] in marriage dissolution issues between ... two constitutionally equally qualified parents," 385 Md. at 354, 869 A.2d at 771, and not between parents and non-parents. Once the State inserts itself into the parenting situation, by reason of the unfitness of the parents or as a result of other circumstances, the "best interest of the child" standard is applied. 385 Md. at 355, 869 A.2d at 771.

Thus, in *McDermott*, a typical "third-party" custody dispute, where persons other than the natural parents or the State are attempting to gain custody or visitation with respect to the children of natural parents, we noted that:

"the 'best interest' standard is inappropriate *unless the finder of fact first finds that the natural parents are unfit,* the natural parents by their conduct have waived or lost their 'constitutional protections,' or there is a finding of extraordinary, exceptional, or compelling circumstances that require the court to remove the child from the natural parents in order to protect the child from harm. It is only if the parents are unfit, or if there is some exceptional circumstance exposing the child to harm, that the child may be removed from the custody of the parents. If a prelimi-

nary finding of parental unfitness or extraordinary circumstances is made, the court is then faced with what to do with the child. In only that context, then, after such preliminary findings are proved, may the custody of the child be based on a 'best interest' standard."

385 Md. at 357, 869 A.2d at 772 (emphasis added). Furthermore,

"the non-constitutional best interests of the child standard, absent extraordinary (*i.e.,* exceptional) circumstances, does not override a parent's fundamental constitutional right to raise his or her child when the case is between a fit parent, to whom the fundamental parental right is inherent, and a third party who does not possess such constitutionally-protected parental rights. In cases *between fit natural parents* who both have the fundamental constitutional rights to parent, the best interests of the child will be the 'ultimate, determinative factor.' ... In respect to third-party custody disputes, we shall adopt for Maryland, if we have not already done so, the majority position. In the balancing of court-created or statutorily-created 'standards,' such as 'the best interest of the child' test, with fundamental constitutional rights, in private custody actions involving private third-parties where the parents are fit, absent extraordinary (i.e., exceptional) circumstances, the constitutional right is the ultimate determinative factor; and *only if the parents are unfit* or extraordinary circumstances exist is the 'best interest of the child' test to be considered, any contrary comment in ... our cases, notwithstanding."

385 Md. at 418–419, 869 A.2d at 808–809 (emphasis added).

In the case *sub judice,* a third party desires to relinquish parental rights, not assert them. There simply is no contest over parental rights. There is no issue of unfitness on the part of the father. Moreover, there is nothing with which to measure the father's ability to be a parent against, in order for a trial court to rule that it is *not* in the best interests of the child to grant the father the relief he seeks. Accordingly, the implication by the trial court that the BIC standard should be

used in the case *sub judice* is inappropriate, and its use by the trial court was error.

## C.

█ It requires noting that surrogacy contracts, that is, payment of money for a child, are illegal in Maryland. Two statutes, Maryland Code (2002, 2006 Supp.) § 3–603 of the Criminal Law Article, entitled "Sale of minor" [18] (formerly entitled "Child Selling," Maryland Code (1957, 1992 Repl.Vol.) Article 27, § 35 C) and Maryland Code (1999, 2006 Repl.Vol.) § 5–3B–32 of the Family Law Article, entitled "Prohibited payments" [19] (formerly entitled "Prohibited Compensation," Maryland Code (1984, 1991 Repl.Vol.) § 5–327(a) of the Family Law Article) so provide. We have enforced these statutes. *See State v. Runkles,* 326 Md. 384, 605 A.2d 111 (1992) (holding that Article 27, § 35E was not limited to payments

---

18.  Section 3–603 provides as relevant:
   " § 3–603. Sale of minor
    "Prohibited
   "(a) A person may not sell, barter, or trade, or offer to sell, barter, or trade, a minor for money, property, or anything else of value.
   "(b) A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both for each violation."

19.  Section 5–3B–32 provides:
   " § 5–3B–32. Prohibited payments
    "Prohibited act
   "(a) Except as otherwise provided by law, a person may not charge or receive, from or for a parent or prospective adoptive parent, any compensation for a service in connection with:
   "(1) placement of an individual to live with a preadoptive family; or
   "(2) an agreement for custody in contemplation of adoption.
    "Construction of section
   "(b) This section does not prohibit payment, by an interested person, of a reasonable and customary charge or fee for adoption counseling, hospital, legal, or medical services.
    "Duty of State's Attorney
   "(c) Each State's Attorney shall enforce this section.
    "Penalties
   "(d) A person who violates any provision of this section is guilty of a misdemeanor and on conviction is subject to a fine not exceeding $100 or imprisonment not exceeding 3 months or both, for each offense."

connected with an adoption, but also included the relinquishment of custody of a child for money); *In re Adoption No. 9979*, 323 Md. 39, 591 A.2d 468 (1991) (holding that FL § 5–327 barred payments made by the adopting parents directly to the birth mother to cover the cost of maternity clothing); *Stambaugh v. Child Support Enforcement Admin.*, 323 Md. 106, 591 A.2d 501 (1991) (holding that an agreement between a divorced couple under which the ex-husband consented to the adoption of the couple's children by the wife's new spouse in exchange for the waiver of child support that was in arrears was void as contrary to public policy under both FL § 5–327 and Article 27, § 35E).

Finally, we reiterate that the Division of Vital Records has expressed no objection to the removal of the gestational carrier's name from the birth certificate in response to an order of the Court. In a letter written to the Birth Section Chief of the Maryland Division of Vital Records outlining several previously discussed provisions dealing with instances of this nature, the Section Chief signed, and in turn, acquiesced to, the following passage:

> "If a biological parent is unmarried, and is the only intended parent (usually the father); and the surrogate, her husband, and the biological father were to execute an Affidavit of Parentage indicating that the biological father is the father, the surrogate's husband agrees and relinquishes all parental rights that he may have, if any, the registrar would report that information. The Division would issue a birth certificate for the child with the surrogate as the mother and the biological father as the father. Or if the surrogate were unmarried and she and the biological father executed the Affidavit of Parentage, the registrar would report that information. The Division would issue a birth certificate for the child with the surrogate as the mother and the biological father as the father. *Then if the biological parent and/or surrogate wanted all information regarding the mother removed from the birth certificate, the father could institute an action in Court to obtain an Order specifying the information to be removed. Such an order may be ob-*

*tained, perhaps, through adoption or a proceeding to determine parentage. After receiving such a Court Order, the Division would issue a new birth certificate removing the information in accordance with the Court's directions."*

Letter from James A. Shrybman, Attorney, Law Offices of James A. Shrybman, P.C., to Kathryn A. Morris, Birth Section Chief, Maryland Department of Mental Hygiene, Division of Vital Records (April 21, 2001) (on file with author) (emphasis added).

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY REVERSED. CASE REMANDED TO THAT COURT FOR PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE STATE.

RAKER, CATHELL and HARRELL, JJ., Dissent.

Dissenting Opinion by CATHELL, J.

I dissent.

This case illustrates that the process of manufacturing children can lead to unusual situations that would have been virtually inconceivable decades ago when the relevant statutory scheme was enacted. I do not necessarily agree or disagree that the remedy for the present situation created by the majority is appropriate or otherwise. I think it is wrong for the majority to fashion, in the first instance, the public policy it is creating as a remedy. The issues present in this case, going as they do to the very heart of a society, are, in my view, a matter for the Legislative Branch of government and not initially for the courts.

It is important to note what this case is not. It is not about a woman, married or otherwise, wanting to be a mother, who has difficulty in conceiving through sexual intercourse or who does not want to conceive through sexual intercourse or direct artificial insemination, and thus wants to have her egg fertilized outside her body and then implanted back into her womb where she will, hopefully, be able to give natural birth to a child she will raise as the mother. This case has nothing to do

with attempts to cope with female fertility problems of any kind. In this case (so far as the record reflects), there is no woman, genetic mother, birth mother, or otherwise, who wants to mother the resulting child or who wants her name on the birth certificate.

This is simply the case, apparently, of a man who wants to be a father and, recognizing that he could not do it by himself, went out and arranged for (perhaps hired) two different women and an assembler to help him manufacture a child-one woman to donate (or sell) the egg (a genetic mother), a technician (apparently paid) to fertilize the egg in a dish,[1] and another woman (the birth mother) to carry the fetus through the gestation period and then to eject the child in what would normally be considered the birthing process. At the end of this manufacturing process, the result is a child who, according to the majority, is to have no mother at birth.

The hospital, having some familiarity with normal birthing processes, understandably perceives what happens to be a birth and places the name of the woman from whence the child has come (at least the child emerged from the birth canal of the woman), on the birth certificate as required by State law. Everybody, (except the child and the hospital) then claims foul because the law requires the naming of a mother on a birth certificate. Then the majority of this Court joins the clamor and decrees that the child has no mother at birth—a concept thought impossible for tens of thousands of years.

One supposes that under the aegis of what is occurring in this case, that if a source of sperm does not intend to be a father, he could assert that he was not the father,[2] and under

---

1. The record is unclear as to the source of the sperm.

2. The majority holds that it is a violation of the Equal Rights Amendment for women not to be able to disclaim maternity altogether, even though one of them produces the egg and the other carries it through gestation and it emerges from her birth canal—because a man has a right to challenge paternity. The majority fails to acknowledge that what a man challenges is that it is his sperm that fertilized the relevant egg. In the present case, there is no challenge to the fact that the

the theories of the majority, a child could come into the world with neither a mother nor a father at birth.[3]

As noted, the appellant and the majority, assert that there is inequality in the treatment of the respective genders, in that a man is permitted by statute to deny paternity—to deny that he is the father of the child because there is a procedure in which that denial can be litigated. He[4] argues that there is no similar method by which a woman can deny maternity. However, that is not the issue in the present case. The relevant woman is not denying that she produced the egg that was fertilized. Neither appellant nor the woman that carried the child through the gestation period deny that she bore and delivered the child and that it came out of her birth canal. If appellant or either of the women were asserting the same

particular woman produced the egg and that the other woman bore the child and "birthed" it. The equivalent really would be, if the father acknowledged that his sperm had fertilized the egg, but that at the time of intercourse he did not intend it to do so or to be a father and thus the Court should declare him not to be the father. If such a provision existed for a father but not a mother, the Equal Rights Amendment might be violated. But it does not now exist for either by statute, although with the majority's opinion it will now exist for the mother but not the father—a situation that may well be a violation of the Equal Rights Amendment. That amendment guarantees equal treatment to men as well as women.

3. With the majority's decision today that the mother from whom the child is delivered is not to be considered the mother (and apparently the donor of the egg is not to be considered the mother), the Court opens up the very real possibility that completely disinterested persons will (or could) commence the manufacture of children. For instance, an entrepreneur could contract with a sperm donor, contract with an egg donor, contract with an assembler, contract with a woman to carry the child through the gestation period, and a child could be manufactured with neither a mother nor a father. The child could then be put up for adoption at a price—and a new business, in the spirit of American ingenuity, is created. That is, of course, if it can be determined who, if anybody or any entity, would have custody of the child. This is, I realize, virtually incomprehensible to reasoned thought—but, why will it not be something that can happen on the way down the "slippery slope" created by the majority?

4. The man that made the arrangements is the plaintiff in this case and, perhaps, the donor of the sperm.

issue that exists in paternity litigation, the majority might have a point. What the majority fails to realize in its opinion, is that what a man is doing when he challenges paternity is that he denies his particular involvement in fertilizing an egg and thus he asserts he is not the particular or correct father of the child—a man is not asserting that the child has no father at all.

In the present case, what the majority does, is to establish as a matter of public policy that it is possible for there to be a denial of all maternity, i.e., that there is no mother at all at birth, not that a particular woman is not the mother. The majority, in essence, holds that if you do not intend to be the mother, you should not be responsible as a mother. There are probably tens, if not hundreds of thousands, of fathers (and certainly mothers as well) who did not intend to be parents at the time of the actions that led to conception, who have been judicially determined to be responsible for the support of the child they did not intend to conceive. With the majority's decision today, if a genetic and/or birth mother does not intend to act as a mother during this manufacturing process— they have no responsibility as a mother. Presumably, now both fathers and mothers (participating in invitro fertilization or sexual intercourse), if they enter into contracts or other writings or agreements, providing that neither intends to be a parent, or just engage in acts without any agreement, in which a child is conceived, the mother and the father (because he must be treated equally as well) can claim that no one should be responsible for the rearing and support of the child(ren). Presumably, under such circumstances the only responsibility for the rearing of children would be the State's.

If ever there was a strained interpretation of a statute, the majority's attempt to construe Maryland Code (1982, 2005), § 4–211(a)(2)(ii), which allows the issuance of new birth certificates when a court enters "an order as to the parentage" of a child, as contemplating the issuance of certificates of birth showing that a child had no mother at birth, is it. The majority recognizes this to be the case when saying: "The paternity statute, clearly, did not contemplate the many poten-

tial legal issues arising from these new technologies, issues that will continue to arise unless the laws are rewritten or construed in light of these new technologies." *Ante* at 279, 923 A.2d at 122. Yet it sets about changing the reach of the statute because, "What has not been fathomed, however, exists today." *Ante* at 279, 923 A.2d at 134. Then the majority creates new public policy permitting the manufacturing of children, saying:

> "Again, the paternity statute, as written, provides an opportunity for genetically unlinked males to avoid parentage, while genetically unlinked females do not have the same option. This Court has found that any action by the State, without a substantial basis, that imposes a burden on, or grants a benefit to one sex, and not the other, violates the Maryland Equal Rights Amendment."

*Ante* at 279–80, 923 A.2d at 134 (footnote omitted).

I suggest, that the majority's decision today is not what was fathomed when the General Assembly enacted the relevant statute and also was not what the people of the State thought they were approving when they approved the Equal Rights Amendment (the writer amongst them). It simply defies common sense and all principles of logic to hold that the people of the State and their representatives thought at the time they were enacting and approving the statute and the Constitutional Amendment, that they were permitting the courts to create a procedure whereby children would end up not having any mothers, even at birth.

Additionally, as noted earlier, when, in this case, the majority of the Court holds that it is permissible for a child to be listed as having no birth mother (either the donor of the egg, who is actually the genetic mother, or the woman who carries the fetus through gestation and then "births" the child), partially on the implied basis that neither intended to be a mother, they are creating a violation of the Equal Rights Amendment in doing so. If a genetic mother and a birth mother can deny maternity because neither intended to be mothers, men, who at the time of intercourse in many instances do not intend to be fathers either, can certainly present an

argument that they are being discriminated against. If genetic and birth mothers can deny all maternity, why cannot genetic fathers and fathers present at birth deny all paternity. In so far as the Constitution is concerned, it would make no difference if the child results from accident or intent. One could even logically determine that a person who intends conception to occur (for whatever purpose), as opposed to one who hopes it would not, should have at least some, if not more, of a support burden.

I point to the possibilities discussed in this dissent, even though some may consider them to be remote, to highlight why the issues presented here should be left to the Legislative Branch to first address. That entity has the resources, via studies and commissions, better access to ethicists and social scientists, and the like, to fully explore the full range of questions surrounding this issue and similar issues that will inevitably occur in the future.[5] This Court simply lacks the resources available to the General Assembly.

---

**5.** Other countries recognize the need for ethical overview of new and emerging fertilization techniques. In England, in an article entitled *The prospect of all-female conception,* the author notes:

"Scientists are seeking ethical permission to produce synthetic sperm cells from a woman's bone marrow. . . .

"Creating sperm from women would mean they would only be able to produce daughters. . . . The latest research brings the prospect of female-only conception a step closer.

"We are in the process of applying for ethical approval.

"Whether the scientists will ever be able to develop the techniques to help real patients-male or female-will depend on future legislation that the Government is preparing as a replacement to the existing Human Fertilisation and Embryology Act."

Steve Connor, *The prospect of all-female conception,* The Independent, April 13, 2007, http://news.independent.co.u k/world/science—technology/article2444462.ece (last visited April 13, 2007). With the developing science in the area of manufacturing children, and with the problems associated with expanding populations, I would respectfully suggest that courts are uniquely unsuited to lead the ethical debates that lie in the near future. Better, in my view, would be a position where the courts, as with most areas of great social concern, initially defer to the processes of the legislative branch where all of the important issues can be rationally debated, instead of courts charging to the forefront, and thus generating the debate as a reaction to their decisions. The issue before the Court today has not been simmering unanswered for decades

In my view, if ever there was an instance for deference to the Legislative Branch of government—to permit it an opportunity to set public policy—it is this case. Instead, less than seven unelected (in contested elections) judges, are, in essence, stating that it is good public policy for the people of this State to permit the manufacturing of children who have no mothers—even at the moment of birth. The majority today eliminates, in circumstances such as these, a mother from whom a child could depend upon for support. What is going to happen, if in fact men are afforded the same rights that the majority says in the present case are due to women? There would be no father upon whom the child could depend upon for support—and no mother upon whom the child could depend. The decision the Court renders today has broad consequences for the State that must support children for whom there are limited or no means of support. This is another reason to defer to the Legislature—to determine issues relating to the best interests of children, and the resulting State responsibility if the position of the majority were to be the law of this State.

Additionally, the literature relating to families is replete with conclusions respecting the value of having fathers as a part of the process of family life-available from the birth of the child. Certainly there is similar, or even greater, value in having mothers involved in the rearing of children. Until now, I presume that it was not thought necessary to specifically relate such issues to females in that mothers obviously were going to be present at birth. But with this case, according to the majority, there is to be no mother—just a petridish.

One only has to contemplate what might occur as the child matures, in order to believe that this issue is best left to the representatives of the people. What happens when a child is asked to present a birth certificate at a customs area in a foreign country (until recently that is all that was required of American citizens in many countries, and remains so in some)

---

while the General Assembly ignores it; as far as the record shows this is the first instance this issue has been raised in any forum in this State.

and a customs inspector sees that the birth certificate indicates that the person standing in front of him or her states that the person has no mother—or even no father *or* mother? What happens when the child presents such a birth certificate to authorities outside (or inside) this State in an attempt to acquire a passport? What happens when such a certificate is presented in the admission processes of colleges or presented when one wants to enlist in the armed services? How is the child going to be adversely affected throughout its minority when it has no mother from whom support can be obtained— and no mother at all? There are many reasons why the General Assembly might decide that it is in the best interests of children to have a surrogate or donor mother's name on a birth certificate and that, if afterwards she could establish that she should not have the obligations of a mother, she could seek the termination of her status in order to end her legal responsibility. But the Court assumes the policy mantle instead.

Certainly, there can be answers developed in respect to all of these questions and the many others that may exist that I have not presented. But, courts, including this Court, are uniquely unsuited for the tasks that will lie ahead. I differ from my colleagues in the majority, not so much because I believe them to be necessarily wrong in their ultimate result (as long as it will be applied equally to men), but because I think they are wrong in the doing of it. This issue, and the many similar ones, that will now arise, are best left to those who are closer to the people than those of us in our so-called "ivory towers" (although it could be argued that our towers are mahogany and red) who are constitutionally removed from the people of the State.

By its holding, the majority, in my view, under the circumstances of the issues presented here, has discarded the principle of judicial restraint in favor of one that improperly usurps the power of the General Assembly. Somewhere in this mad rush in which our society is engaged, at a time when increasing population contributes to many of the world's problems,

even judges should occasionally pause and say, "What are we doing?"

I would affirm the finding of the trial court that the resolution of this issue does not lie within the Judicial Branch of government but within the Legislative Branch.

Dissenting Opinion by HARRELL, J., which RAKER, J., Joins.

We dissent not because we are persuaded that the Majority opinion necessarily is incorrect, but rather because, on the record before us, we are unpersuaded that the Majority opinion is correct or the question necessarily must be decided at present. We hasten to explain the seeming conundrum.

The Majority opinion supplies a judicial gloss to the Maryland statutory scheme for establishment of paternity,[1] ostensibly in order to avoid declaring the statute violative of equal protection principles, a conclusion it indicates it otherwise would reach if forced to confront the challenge frontally. Maj.

---

1. Chauvinistically titled, Subtitle 10 of the Family Law Article of the Md.Code ("Paternity Proceedings") indeed sends mixed messages about establishment of the titles of parent, father, and mother. Although claiming that one of its purposes is "to impose on the mothers and fathers of children born out of wedlock the basic obligations and responsibilities of parenthood" (§ 5–1002(b)(2)), most of the mechanisms for resolving questions of questioned parenthood are framed in terms of ascertaining who is the father, as the Majority opinion accurately points out. It is obvious that the statute, in its current state, is a product of simpler scientific times regarding the process of human reproduction. Paternity historically was the usual question, where unmarried or adulterous coupling was concerned, because a father's contribution leading to a birth often occurred under the cover of darkness (literally or figuratively), while a mother's giving birth to the child traditionally occurred under the bright lights of a hospital room or the eyes of a midwife, though not always so. That a woman gave birth largely was undeniable, while who the father was often was the subject of some contention. It is now undeniable that advances in the science of reproductive technologies have created new challenges and a certain amount of obsolescence in many of the underlying premises of the paternity statute as it exists presently. The Majority opinion points that out well. The situation cries out for legislative review and action, but not necessarily judicial intervention at this point and certainly not on the record before us in this case.

op. at 279–84, 923 A.2d at 122–25. If actually confronted with a constitutional question that appropriately may be evaded, we count ourselves among the last who would criticize such a jurisprudential side-step. The specific question the Majority opinion conceives as being raised, apparently properly, by Appellant is: "Must the name of a genetically unrelated gestational host of a fetus, with whom Appellant contracted to carry *in vitro* fertilized embryos to term that resulted in children being born, be listed as the mother on the birth certificate?" Maj. op. at 270, 923 A.2d at 117. The analysis in which the Majority opinion engages explores deep issues, with ripples extending well beyond those raised on the record before us. We should not set sail prematurely upon this great legal and societal ocean without a better global positioning system (e.g., thorough opposing briefs and a well-developed record) as a guide. Instead, we should vacate the decision of the Circuit Court for Montgomery County and remand for further proceedings.

This case proceeded essentially as what tennis players call a walkover. That is, there was no opponent on the other side of the net; no person or entity to expose or test Appellant's contentions, factual or legal; a situation which the Majority opinion sweeps up and describes simply as "the unusual procedural posture of this case." Maj. op. at 271, 923 A.2d at 117. Appellant, the unmarried contributor of the sperm that was used in a laboratory to fertilize the eggs obtained from the unmarried egg donor, filed a two page petition in the Circuit Court for Montgomery County asking, among other things, that Holy Cross Hospital be "authorized" to report to the Maryland Division of Vital Records that the twins born to a third party surrogate "carrier" of the fertilized embryos have *no* mother. Appellant sought to be designated as the father and the children assigned his surname. No equal protection argument, expressly or implicitly, was advanced. Accompanying his petition were three affidavits, one from Appellant, one from the egg donor, and one from the surrogate carrier.

The egg donor, a friend of Appellant, attested on 6 August 2001 that she was unmarried at the time of donation and that it was her understanding that, if, as, and when viable embryos

were created from the joining of her eggs and Appellant's sperm, some other woman would carry the embryos to term, and "the child(ren) will be registered as the biological child(ren) of the father and the surrogate," with an attempt thereafter made to delete the surrogate's name as mother on the birth certificate.[2]

The surrogate, who gave birth to the children at Holy Cross, stated in her 24 August 2001 affidavit, that she was not "in any way genetically related to the children born to me on August 23, 2001" and that she did not want "to be named in any way on [their] birth certificates...." She consented to the relief sought by Appellant. Her affidavit and that of Appellant were subscribed to before Appellant's then-counsel, who served as notary public. No copies of any written contractual agreements between Appellant, the donor and/or the surrogate carrier were alluded to in, let alone attached to, the petition, consent, or affidavits. No averments were alleged in the petition, affidavits, or consent as to consideration supporting the alleged undertakings and understandings as stated between the three participants. The petition was denied, without hearing, by succinct order of court dated 29 August 2001 and filed on 6 September 2001.

On or about 17 September 2001, Appellant filed a motion for reconsideration, through his then-counsel (the same person who represented him in filing the original petition and supporting papers and who notarized Appellant's and the surrogate's affidavits). Besides reiterating the allegations of the original petition, Appellant's then-counsel contended:

> The Court's denial of Petitioner's request leaves Petitioner and the surrogate in a legally awkward posture. The birth certificates for the subject children will now bear the Peti-

---

**2.** Moreover, the donor expressed in clear language that she wanted no relationship or responsibility for any children born from the fertilized eggs. Specifically, she stated "I do not want my name on any birth certificate(s) ... and if my name does somehow get placed on such birth certificate, I want it removed."

tioner's name as the father and the surrogate's name as the mother.

Thus, the Court's action has the operative effect of allowing inaccurate information to be filed in official State records; and of bestowing parental rights and responsibilities on the surrogate who has no biological or adoptive parental link to the children—and expressly made clear that she did not want any. In so doing, the operative effect on the Petitioner is to diminish his sole/exclusive parental position to a shared parental position in which his rights and responsibilities only extend to the point where hers (even though they are biologically and legally nonexistent) begin. The operative effect of the Court's denial also impacts future inheritance rights of the subject children and those of the surrogate's own biological children, even though they are in no way parties to this matter.

None of the persons sought, or even expected, and do not want the result that will occur. Indeed, the very purpose in petitioning the Court was to obtain the court's assistance in clarifying the accurate parentage, to ensure that correct information would be filed with the State, and to avoid precisely the result which would come to pass in the absence of the Petitioner instituting this matter.

The entire thrust of the reconsideration motion was whether reporting the surrogate as the children's mother was inaccurate. No equal protection argument regarding the application of the paternity statute was mounted.

In response to the motion for reconsideration, the Circuit Court issued an order, dated 2 October 2001 and filed on 4 October 2001, declaring Appellant the father of the twin girls and directing Holy Cross Hospital to issue birth certificates for the children with Appellant's surname, but including the surrogate birth mother's name as their mother. On 1 November 2001, Appellant's then-counsel filed a request for hearing on the reconsideration request, complaining that he did not receive a hearing on the motion, although one was requested, and that the Court's 29 August order denying relief and its 2 October 2001 order granting some, but not all of the relief

sought originally, "seem[s] somewhat unclear or inconsistent." [3]

A hearing on the motion for reconsideration was set for 10 December 2001. Replacement counsel entered her appearance for Appellant (and who continued to represent him on appeal) on 7 December 2001, the same day on which separate counsel entered an appearance for the surrogate. No consideration of appointing counsel for the children was evident. The hearing on reconsideration was rescheduled for 14 January 2002.

In Appellant's 14 January 2002 hearing memorandum, he nowhere raises a facial or as-applied equal protection challenge to the statutory scheme. His arguments there were that the "gestational surrogate" was not the mother and was in no way biologically related to the children; therefore, it was asserted to be in the best interest of the children *not* to have her name appear on the birth certificates. Appellant thus argued the best interest of the children standard in the case, albeit in a way that benefitted only his desired result. It was contended in the memorandum, for the first time in the proceeding, that Appellant "entered into a variation to the traditional surrogacy contract called a 'gestational surrogate contract'." In such an arrangement, it was claimed, while "one or both of the prospective parents may be biologically related to the child, [t]he surrogate provides only a 'host uterus'." No copy of the contract was attached to the memorandum, nor was it offered at the hearing.

At the 14 January 2002 hearing on the previously denied motion for reconsideration, Appellant's new counsel uttered the words "equal protection" for the first time in this record:

> You can take a putative father and as I said it a moment ago, you can hang that child on him. You can say if you don't want to be the father, we will haul you into court. We will take your genetic material. We will match it to the

---

**3.** We find no lack of clarity or inconsistency. Appellant may have been chagrined that he did not get everything he sought, but he had no claim to lack of clarity or consistency.

child and if it matches, you're the father. You're the parent. It is at the moment that we can determine that the genetics match, that the obligations, duties and rights of parenthood attach to that individual.

You would have an equal protection argument if you said that well, that is not true for the mother. It is the passage down the birth canal that makes the mother the mother, not the genetics.

Further relevant reference does not appear until ten pages later in the transcript when Appellant's counsel obliquely (giving her the benefit of much doubt) alludes that:

The legislature has tried over the past two decades no less than five times to deal with this issue and they have not been able to do so when they have passed laws one way, the Governor has vetoed them. When they have passed laws the other way, they fail in one House or the other. It is— there is a paucity of law. I agree with that.

But should Courts be called upon to deal with these issues when the legislature doesn't? Sometimes the court has to lead and we can all think of the cases where the Court has done that. They all do it in the areas of Civil Rights and Equal Rights and that is where this case is.

Counsel for the surrogate, other than adopting a "me too" approach regarding what Appellant's counsel said, did not mention, explicitly or implicitly, an equal protection argument. She filed no legal memorandum and failed to invoke any legal authorities. In essence, the one-sided argumentative presentation to the Circuit Court was essentially purely policy-driven.

In the Circuit Court's 9 July 2002 bench ruling reaffirming and explaining its earlier denial of the motion for reconsideration, the trial judge stated, among other things, that he was concerned greatly, on this record, with whether it was in the best interests of the twins that they be declared effectively motherless. The Court also saw, as a partial solution to the complications expressed by Appellant and the surrogate mother, the prospect of a consent petition to terminate the surro-

gate mother's rights (but which would leave her named on the birth certificates as "mother"). It seems clear that the trial judge did not perceive Appellant's or the surrogate's legal arguments seriously to include an equal protection challenge because he did not address such a contention.

The appeal noted to the Court of Special Appeals by Appellant was not joined by the surrogate. She filed no appeal and no brief. Her counsel, in a letter to the Court, indicated nonetheless that "she wished to join in the brief of the Appellant." Thus, the case, when taken by us, on the Court's initiative, before the intermediate appellate court could act, proceeded with only Appellant's inadequate (in our view) brief and his not-much-more enlightening oral argument.

We are satisfied that, on this record, an equal protection challenge to the Maryland paternity statute, factually or as applied, was neither properly presented, argued, or decided in the Circuit Court. Combined with the one-sidedness of how the matter proceeded in the Circuit Court and before this Court, and the gaps in the record, we are unwilling to exercise the discretion granted by Md. Rule 8–131(a) ("[o]rdinarily, the appellate court will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court, but the Court may decide such an issue if necessary or desirable to guide the trial court or to avoid the expense and delay of another appeal.") to reach and decide the issues decided by the Majority opinion.[4]

---

**4.** Appellant's brief in this Court is woefully inadequate to support the license taken by the Majority opinion. His entire equal protection argument in his brief is as follows:

**The parentage statutes as enforced by the court below do not afford equal protection of the law to men and women similarly situated.**

If the gestational carrier was a man she could deny parentage. And if no genetic link could be established, she would be found not to be a parent and the matter would end. Not so with a woman under the lower court ruling.

She has asked to be removed from the children's birth certificates. In effect denying maternity. It is established as legal fact that she is not genetically related to either child, yet she is to be forced by the state to be the legal mother of these children.

The condition of the record in the present case is reminiscent of that confronting the Court of Special Appeals in *Dintaman v. Board of County Comm'rs of Prince George's County*, 17 Md.App. 345, 303 A.2d 442 (1973). In *Dintaman*, the plaintiff in the trial court waited until his Motion for Rehearing, filed after summary judgment was entered against him, to raise constitutional arguments of denial of due process and equal protection. 17 Md.App. at 347, 303 A.2d at 443. The motion was denied, without a hearing, in a terse order which made no mention of the constitutional arguments. *Id.* The intermediate appellate court, when Dintaman pressed his constitutional attack before it, opined:

It is not entirely clear that in ruling on the Motion for Rehearing [the trial judge] considered constitutional issues, and indeed it would have been difficult for him to do so because there was no evidence against which such issues could be measured, and they were not developed through the adversary process which is required for their proper determination.

As Chief Judge Murphy said for this Court in *Vuitch v. State*, 10 Md.App. 389, at pages 397 and 398, 271 A.2d 371, at page 376:

The doctor on the other hand, being a man, could challenge paternity and succeed, because he is not genetically related to the children.

Such disparate treatment does not comport with Article 46 of the Md. Dec. of R. art. 46 (2001) which states that "[e]quality of rights under the law shall not be abridged or denied because of sex."

Under the interpretation of the § 4–211 urged by Appellant, no such equal protection argument would exist, because a non-genetic gestational carrier could apply to the court for a parentage order and receive one upon a showing that she was genetically related to the child and never intended to be its parent.

There is already a body of law in this jurisdiction governing the protection of the rights of non-genetically related individuals who desire to fulfill the role of parent for a child.

No cases are offered to support this argument. No effort is made to detail any failed legislative history in addressing the problems envisioned by Appellant, which he boldly claimed to be the case at the reconsideration hearing in the Circuit Court. *See supra* at 6.

But it would be foolhardy in the extreme to undertake the resolution of such complex constitutional questions upon a record as procedurally and substantively deficient as that now before us-one in which the constitutional questions, though readily apparent prior to trial, were raised for the first time after the State had concluded its case-in-chief, and then only by an inappropriate motion (generally alleging unconstitutionality along a front far more limited in thrust than that presently sought to be aired), submitted without comment, or illuminating argument. Whether the trial judge actually considered appellant's constitutional claims cannot be ascertained from the record since in denying the motion he made no comment thereon, and may well have concluded, quite properly, that the constitutional questions could not be raised at that juncture of the proceedings by motion for judgment of acquittal. Of course, nothing is better settled than the rule that a question as to the constitutionality of a statute will not be considered on appeal when not properly raised and decided by the lower court.

*Id.* at 350–51, 303 A.2d at 444–45. *See also Harmony v. State,* 88 Md.App. 306, 316–17, 594 A.2d 1182, 1187 (1991) (internal footnotes omitted):

Pursuant to Md. Rule 8–131(a), ordinarily, we do not decide any issue unless it "plainly appears by the record to have been raised in or decided by the lower court." It is clear that the limitations argument was never "decided" or "directly passed upon" by the circuit court. Nor was the question ever argued in the traditional sense. Indeed, it was barely mentioned below. "To preserve an issue for appellate review, it must first have been presented, with particularity, as to the trial court." An offhand remark that the "statute of limitations or something like that" might "come into play" is simply not particular enough to allow appellate review. A party must bring his argument to the attention of the trial court with enough particularity that the court is aware first, that there is an issue before it, and secondly, what the parameters of the issue are. The trial

court needs sufficient information to allow it to make a thoughtful judgment.

\* \* \*

He was required[ ] to present the issue to the trial court with enough particularity to allow a reasoned decision upon the matter. Because he failed to do so, we will not consider the issue on this appeal.

We believe the interests of the children need to be heard and considered. We would remand the case and direct the trial judge to appoint counsel for the twins and compel Appellant to pay their counsel's legal fees. Only then might a record be made upon which we might be satisfied that we should go where the Majority opinion goes.

The Majority opinion's disposition of the best interests of the child(ren) standard as "inappropriate" (Maj. op. at 292–93, 923 A.2d at 130–31) to the context of this case depends in large measure on its declination to come to grips with the legal meaning of "parent," "mother," or "father," in light of the admitted and relevant scientific advances apparently not contemplated by the statutory scheme. The Majority's analysis (Maj. op. at 284–93, 923 A.2d at 125–31) beggars the meaning of these key concepts, and focuses instead on analytical differences between custody and visitation cases involving parent-versus-parent on one hand and parent versus non-parent on the other. The Majority opinion overlooks that it was Appellant who injected the best interest of the children standard in this case. We can think of a number of emotional, material support, and possibly medical reasons why it may not be in the best interests of these children to be declared motherless. It should not be left entirely to judicial conjecture and creativity, however, what the universe of those reasons may be. This record begs for further development before we come to grips with the issues decided by the Majority opinion. If Appellant wishes us to lead through uncharted Maryland waters in an area where the Legislature

is better suited to consider the competing legal and societal values, but may have been unwilling to do so, he needs to do a better job of persuading us if he wants our vote.

Judge RAKER has authorized me to say that she joins in this dissent.